STATE OF NORTH CAROLINA v. WILLIAM MATTHEWS AND
VICTOR FOUST

No. 68

(Filed 14 July 1978)

1. **Criminal Law § 15.1— change of venue—no prejudice from newspaper articles—motion properly denied**

   In a first degree murder case the trial court properly denied defendants' motions for a change of venue or a special venire since defendants did not contend that newspaper articles about their first trial were either biased or inflammatory; defendants' contention that news coverage which accurately reported the case and previous trial could be so "innately conducive to the inciting of local prejudices" as to require a change of venue was without merit; and the fact that the defendants were black and the victim white was mere happenstance, not *per se* grounds for a change of venue or special venire.

2. **Jury § 7.12— jurors opposed to capital punishment—grounds for proper challenge**

   In a first degree murder case tried in August 1975, the trial court did not err in allowing the district attorney to challenge for cause 14 jurors, each of whom indicated that he was so opposed to capital punishment that, regardless of the evidence and even if convinced beyond a reasonable doubt of defendant's guilt, he would not return a verdict requiring the death sentence, the decision of *Witherspoon v. Illinois*, 391 U.S. 510, not having restricted the right of the prosecution to challenge for cause those jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to defendant's guilt; moreover, *Witherspoon*-related errors in the selection of the jury affect only the sentence of death and will not be held grounds for upsetting a conviction and ordering a new trial.

3. **Jury § 5.2— black defendants—white jury—no grounds for new trial**

   The black defendants are not entitled to a new trial because all the jurors impaneled to try their case were white.

4. **Jury §§ 7.6, 7.14— juror accepted by State—subsequent challenge by State permissible**

   The trial court did not err in allowing the district attorney to reexamine, and then excuse, a venireman after indicating that she was satisfactory to the State, since neither the case law nor G.S. 9-21(b) prohibits the trial court, in the exercise of its discretion before the jury is impaneled, from allowing the State to challenge peremptorily or for cause a prospective juror previously accepted by the State and tendered to the defendant.

5. **Constitutional Law § 29— pretrial showup permissible**

   So long as the circumstances were not unnecessarily suggestive, police officers were free to arrange a confrontation between defendants (whether they

were under arrest or not) and three witnesses to the alleged crimes, since defendants had no right not to be viewed.

**6. Constitutional Law § 43— crime suspects—participation in showup—no right to counsel**

Custodial arrest of a mere suspect does not constitute the initiation of "adversary judicial proceedings" and is not sufficient to draw the State and the prisoner into such an antagonistic relationship as to require the assistance of counsel from that moment forward; therefore, defendants, who were not formally charged with a crime but who accompanied officers to a police station for the purpose of participating in a showup, were not entitled to counsel at the showup.

**7. Constitutional Law § 29; Criminal Law § 66.17— suggestive pretrial showup—in-court identification of independent origin**

Though a showup in a first degree murder case was inherently suggestive because the witnesses would likely assume that the police had brought them to view persons whom they suspected might be the guilty parties and because two of the witnesses knew that officers had located the green Cadillac in which four black males came to the service station, the scene of the crime, earlier in the evening and that, through this car, the police had traced the persons they were to view, such confrontation nevertheless did not render inadmissible the witnesses' in-court identifications of defendants, since the witnesses had ample opportunity to observe defendants in the well-lighted service station where the crime took place or in the glare of automobile headlights, and these observations of defendants at the crime scene were not tainted by the impermissibly suggestive showup.

**8. Constitutional Law § 31— denial of free transcript of first trial—alternatives available**

The trial court did not err in refusing defendants' motions for a transcript of the testimony of certain State's witnesses at defendants' first trial which had ended in a hung jury one month earlier, since defendants had available to them at all times during the trial the court reporter at the first trial; the reporter had with her in court her notes and records of the first trial; defendants could have questioned her at any time with reference to the former testimony of any witnesses; and defendants therefore suffered no prejudice from the lack of a transcript.

**9. Constitutional Law § 80; Homicide § 31.1— life imprisonment substituted for death penalty**

Sentences of life imprisonment are substituted for the death penalty imposed upon defendants upon their conviction for first degree murder.

APPEAL by defendants from their conviction of first degree murder in a trial before *Tillery, J.,* at the 18 August 1975 Session of WILSON Superior Court. The case was docketed and argued as Case No. 2 at the Fall Term 1976.

Donald Mayo owned and operated the Spur Go Shop, a Spur gasoline service station on South Goldsboro Street in Wilson, North Carolina. The entire front of the building, including both corners, is clear glass except for the clapboard just below the roof and about two feet of brick construction just above the ground. The two swinging doors which afforded entrance to the service station are entirely glass. In addition to gasoline, Mayo also carried a small stock of groceries and other items.

Mayo was shot during the course of an armed robbery at his station on the night of 11 February 1975. He died one month later as a result of his wound. Defendants William Matthews (Matthews) and Victor Foust (Foust) and two other black youths, Ronnie Lee Matthews and Lawrence Matthews, were charged with the armed robbery in warrants issued on 12 February 1975. New warrants were issued on 12 March 1975 charging them with the murder of Mayo. They were rearrested on 13 March 1975. True bills of indictment were returned against the four at the May 1975 Session of the Wilson Superior Court. Defendants Matthews and Foust were first tried at the 7 July Session. The jury was unable to agree upon a verdict and a mistrial was declared on 20 July 1975.

To properly evaluate the testimony of the State's witnesses it is necessary to locate the Spur station with reference to its surroundings. The record indicates that Goldsboro Street runs north and south, and the Spur station is located on the west side, where Bank Street intersects Goldsboro, immediately south of the tracks of the Norfolk and Southern Railroad. Banks Street is discontinuous at Goldsboro, the western segment being on the south side of the railroad tracks and the eastern segment on the north side.

Linwood Williams (Williams), who was working for Mayo as a station attendant on the night of the robbery, testified in brief summary as follows:

About 8:30 p.m. a solid green 1965 Cadillac, with pink carpet trim around the rear window and covering the rear deck behind the back seat, drove up to the station. Four young black men got out and entered the station. One of them asked for "directions to a woman's house on Spruce Street"; Mayo told them how to get to Spruce Street and all four left. Something about the men

aroused Mayo's suspicions and he noted the license number of the Cadillac on a pad by the cash register.

Later that night, about 10:30 or 10:45 p.m., Mayo was behind the counter putting up cigarettes and Williams was standing at the corner of the door in front of the cash register talking to him, when four black youths arrived at the station on foot. The two who entered first (later identified by Williams as defendants Matthews and Foust) went to the "display island" to the left of the door. There they had a whispered conversation while Mayo and Williams continued to talk. A minute or so later the other two (whom Williams could not identify as Ronnie and Lawrence Matthews) entered the station and purchased a box of matches from Mayo. Thereafter, Matthews came toward Williams, pulled a gun from his shirt, and "leaned up against" Williams, pushing him against the entrance door so that he could not move. At that moment Williams heard Foust coming up behind him and he saw the other two move to the end of the counter. Matthews aimed his gun across the counter at Mayo and told him "to hand the money over." Instead, Mayo stepped back and attempted to pull his own gun. The two youths standing near him (allegedly Lawrence Matthews and Ronnie Matthews) disarmed Mayo in a brief scuffle and knocked him to his knees on the floor. William Matthews called out, "Shoot him, shoot him!" whereupon one of them shot Mayo in the back.

Williams could not testify who fired the shot because, he said, "once he [Matthews] pulled that pistol out, I kept my eyes fastened on it. . . .I'm still staring at that pistol while he is aiming it at Mr. Mayo." Immediately after he was shot one of the four began to search the prostrate Mayo. Matthews told Wiliams to hand over his wallet (which contained six dollars), and Williams handed it to him. Matthews then took forty to fifty dollars, money collected that evening from customers, from Williams' shirt pocket. Matthews then tried to open the cash register, failed, and ordered Williams to open it. All four then took money from the register. Three of the robbers then left; the fourth, Matthews, threw his gun in Mayo's face and asked where the rest of the money was. When Mayo did not respond Matthews also left. Williams observed the three men run across Goldsboro Street and through the yard at 715 S. Goldsboro Street directly opposite the gas pumps of the Spur station. They crossed the railroad tracks

and then "catercornered through that weight scale yard there. From there they went on the other side of that warehouse across the street." When Matthews left he ran in the same direction as the other three. All four recrossed Goldsboro Street at the B. J. High Home Improvement Company just north of the railroad tracks, and "disappeared behind the Spur Station."

Detective R. H. Broadwell was the first to arrive at the Spur station. At that time he spoke briefly with Williams, who was "highly nervous" and very pale. The detective could "make no sense out of what he was saying. He was just talking in riddles." Williams did, however, give Broadwell the license number of the green Cadillac, from which it was ascertained that the car belonged to Ronnie Matthews, Chestnut Street, Greenville, North Carolina. Broadwell then alerted the Greenville police to be on the lookout "for four blacks in a green Cadillac"; that there was reason to believe "it might be connected with the shooting and robbery" at the Spur station.

The testimony of William Branch, aged 17, who drove into Mayo's service station around 10:35 or 10:40 p.m. on the night of the robbery tended to show:

After parking his car at the self-service pump, Branch went into the station and prepaid three dollars for gasoline. He exchanged greetings with Mayo and observed the presence of Williams and four black men. Two were standing in front of the beer cooler. Another was standing by Williams, and the fourth was at the end of the counter. The latter two he later identified as defendants Matthews and Foust. Branch returned to his car, unfastened the gas cap and picked up the hose. When he turned toward the station to signal Mayo to turn on the pump he saw him down on his hands and knees. Sensing trouble, Branch got into his car and drove south on Goldsboro Street. He described his activities thereafter as follows:

"I went down about a block away to White's Tire Service where I stopped and parked my car. I got out and walked across the street to New Planters Warehouse No. 2, mainly so I could see if I could see into the station from that corner of the warehouse there." Branch then returned to his car and drove north on Goldsboro Street, toward the Spur station. He said he was in front of Exclusive Cleaners when "three black guys" ran

across the street in front of the station. He then pulled into the station lot. Upon seeing that Mr. Mayo had been shot he pulled back out of the station lot onto Goldsboro Street and was headed north when his headlights hit Matthews in the face. Matthews was "maybe 25 feet away," running across the street from B. J. High, right across the street from Statewide Scale Company. He was headed east down Banks Street on the north side of the railroad. Branch returned to the station. There he found Williams upset and silent, "like he was in a daze or in shock." Since no one else was at the station he waited until the Police and Rescue Squad arrived.

Donald Ellis, who was driving south on Goldsboro Street around 10:45 p.m. on 11 February 1975, testified in brief summary as follows:

He had slowed down for the railroad tracks and was traveling 20-25 MPH when he glanced to his right into the Spur station. Inside he saw four black men. One was behind the counter moving from one end to the other. Another was standing by Mr. Williams, who was standing over next to the wall against the storage room door. This scene struck Ellis as "sort of suspicious." He went on by, turned around, and started back toward the station. When he came abreast of the vacant lot adjoining the Spur station on the south, he saw three of the black males cross the street, running very fast. These men he could not identify. He drove on by the station, and just as he crossed the railroad track another one ran across the street in front of his car. He was so close that Ellis had to stop to keep from hitting him. When asked if he saw that man in the courtroom Ellis pointed and said, "Yes, sir, the defendant Matthews." After that Ellis saw the defendant Matthews and the other three running down Banks Street and disappear. In a few minutes he returned to the station as the police were driving up. He went in and saw Mr. Mayo on the floor behind the counter.

The State's evidence further tends to show that the Wilson police received information that the Greenville police had picked up some individuals who might have been connected with Wilson's "shooting and robbery." About 1:00 a.m. that same night, Detective Broadwell and another officer tooks Williams, Branch, and Ellis to the police department in Greenville. There the three witnesses were taken into a darkened room from which they

could look through a one-way glass into a well-lighted room where they saw four black men and a uniformed officer. Broadwell testified, "I told the fellows, 'Look in there and see if you see anybody you have seen before.' I said, 'Take your time, we've got plenty of time,' and they did." The testimony of each of the three witnesses with reference to this episode is summarized below.

Williams' version: When the police called him "they said they had picked up four blacks in a green Cadillac and wanted [him] to identify them." Upon arrival at the police station in Greenville, Williams noticed in the parking lot a green Cadillac with "pink carpet in the back glass." It was the same vehicle he had seen about 8:30 p.m. at the Spur station in Wilson. After looking at the four men in the lighted room he positively identified two of them as defendants Matthews and Foust. However, he could not identify Ronnie Matthews or Lawrence Matthews (both of whom were present in court) as the other two men who were in the Spur station at the time of the robbery.

On cross-examination Williams conceded that at the first trial he might have identified Ronnie and Lawrence Matthews as the other two men but said he was confused at that time. He would not identify them now. On redirect examination he said that there was no doubt at all in his mind that Matthews and Foust were two of the four men who robbed the station.

Branch's version: "Later on that night" Detective Broadwell called Branch's father and told him that "they had a lineup of some people at Greenville." The detective said that he wanted to take Branch along with Williams and Ellis to Greenville to see if they could identify anyone they had seen at Mayo's Spur station. Upon arrival at the police station Branch did not see any green Cadillac, but he did see one when he left. Inside the station they were escorted to a room in which there was a "one-way mirror" and told to look in it to see if they could identify anybody. After about 15 minutes Branch was asked if he "noticed" anybody, and he pointed out Matthews and Foust as two of the four men he had seen at the Spur station.

With reference to Ronnie and Lawrence Matthews, Branch said, "I've seen both of them in court before. They were in the room at Greenville and they were in court today. I can't say, though, that they were the other two that were in the Spur sta-

tion that night. They were standing in front of that refrigeration unit in the back, so I didn't get a good look at them. I can't identify them for sure." Branch contended that at the first trial he had said the same thing, that he could not be sure Ronnie and Lawrence Matthews were the other two in the station.

When Ellis testified before the jury neither the State's attorney nor defense counsel asked him any questions about his trip to Greenville.

Detective Broadwell testified that after Williams, Branch and Ellis had viewed the four men at Greenville, "Linwood Wiliams identified Victor Foust . . . , and Bill Branch and Linwood Williams identified Lawrence Matthews. . .Williams and Ellis identified William Earl Matthews to me, but nobody identified Ronnie Matthews."

On *voir dire*, before the introduction of any evidence, and in the absence of the jury, Judge Tillery heard defendants' motion to suppress all testimony from Williams, Branch and Ellis which tended to identify Matthews and Foust as two of the four men who were engaged in robbing Mayo's Spur station. At this *voir dire*, the testimony of Williams, Branch, and Ellis was substantially the same as that later given before the jury. In the main, it differed only in that a few details supplied in one were omitted in the other. For instance, on *voir dire*, Williams told the judge that while the four men were in the station for the second time Branch came in and laid down money for gas from the self-service pump and went out just before the robbery. However, he did not mention this incident in his testimony to the jury.

Also on *voir dire* Williams said that before going to Greenville, Broadwell told him he wanted him "to go over there and see if the four [men] and the green Cadillac were the same ones who came there." Further, he told Judge Tillery that the four men who robbed the station were in the building from 12-15 minutes; that there was "plently of light in the station"; that Foust had been standing at the end of the counter on which Williams was leaning; that he had not only observed Matthews but he had looked into his face as he came toward him with the pistol; that thereafter he kept his eyes on the gun as Matthews leaned against him, pinning him against the door, that as Matthews advanced upon him he saw that Foust moved in behind. He knew,

therefore, that it was neither Matthews nor Foust who attacked Mayo behind the counter. However, it was Matthews who told one of the other two men behind the counter to shoot Mayo. It was also Matthews who threatened to shoot Williams if he did not hand over his wallet, and it was Matthews to whom he handed it. Williams insisted, therefore, that he had correctly identified Matthews and Foust in Greenville as two of the men who robbed the Spur station and that he would have identified them in court had he not seen them in Greenville.

Williams was also positive that the four men who robbed the station were the same four men who came there in the green Cadillac at 8:30 p.m. In explanation of his inability to say whether Ronnie and Lawrence Matthews were the "other two" Wiliams said his glasses needed cleaning; that he had become very upset when he saw Matthews aim the pistol at him, and more upset after Mayo was shot; that he became highly agitated, nervous and confused, this condition lasting several weeks.

On *voir dire* Williams said he believed the last man to leave the station was the one who bent over Mayo with a gun and told him "he was going to finish him off if he didn't tell him where the other money was," but he didn't know. However, he told the jury that "William Earl Matthews was the one who got left behind when the three fled together."

On *voir dire* Branch testified that when he looked into the station to see if Mayo had turned on the pump, he saw Mayo looking at him. He said he also saw defendants Matthews and Foust. "One of them had a gun or something at Mr. Williams" and the other was standing up beside the counter, and that's when he left. These statements were omitted from his testimony before the jury.

On the way to Greenville, Branch said Broadwell told them they were going to Greenville for a lineup to identify the people they saw in Wilson at the Spur station at the time of the shooting. However, he futher testified, "No, no one at the station told me that they had a license number of a green Cadillac. I didn't know anything about a green Cadillac. I didn't see one when I got to Greenville. . . . No, there was no discussion about a green Cadillac on the way to Greenville."

After viewing the four men in Greenville, Branch told Broadwell he believed that Ronnie and Lawrence Matthews were the two men he saw standing at the refrigerator when he went into the Spur station to pay for gas. However, he could not be positive because he did not see them face to face as he had seen defendants Matthews and Foust. Matthews had a scar on his face and Foust had certain facial hair.

On *voir dire* Ellis' account of seeing the four men in the Spur station and in flight thereafter did not differ from his account on direct examination. It did, however, include the following testimony which was not adduced before the jury: After the men had fled he returned to the station. The police had arrived and he "heard some people talking about it" (the green Cadillac), and "someone said they had the license number." However, nobody mentioned it to him. He went home where he later received a call from Detective Broadwell, who told him they had picked up four guys in a green Cadillac in Greenville. "He didn't say the four guys; he just said they had four guys," and he wanted Ellis to go see if he had seen them in Wilson.

In Greenville, Ellis and the others viewed four black men from the small dark room with the one-way mirror. After looking at the suspects, the witnesses entered the room with them and Ellis got just a few feet from them. It took him just a few seconds to identify Matthews, but Matthews was the only one he could identify. He said he had no problem identifying Matthews in Greenville because he had seen him crossing in front of him on Goldsboro Street; that nobody suggested to him in any way that he should identify him; and that he "could identify him today in court even if [he] had not seen him in Greenville." On cross-examination Ellis reiterated that he was sure that his identification now had nothing to do with his identification in Greenville.

At the conclusion of the *voir dire* testimony, the trial judge made findings of fact in substantial conformity to the above outlined testimony and then concluded as a matter of law, "that the in-court identification of the defendants Matthews and Foust by Williams and Branch and Matthews by Ellis was of independent origin and not tainted by any illegal pre-trial identification procedure." Judge Tillery further concluded: "[T]he totality of the circumstances does not reveal pretrial procedures so unnecessari-

ly suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice."

Accordingly, all three witnesses were allowed to identify defendants at trial and were also allowed to testify as to their identification at the Greenville lineup.

The defense presented extensive testimony which tended to establish an alibi for each of the defendants, as well as for Lawrence and Ronnie Matthews, who were then also charged with murder.[1] William Earl Matthews (defendant) is the first cousin of Lawrence and Ronnie Matthews, who are brothers. All three live in Greenville in a big, two-story house belonging to Annie Matthews, their grandmother. Eleven or twelve other members of the Matthews family representing five generations, also live there.

According to defendant Matthews he played basketball on the afternoon of 11 February 1975. Around 6:00 p.m. he met his cousin Ronnie, who drives a green 1965 Cadillac with pink carpet trim in the back. Ronnie gave him and Victor Foust a ride to the Matthews home. (Foust was temporarily staying there, visiting Patricia Matthews, his girl friend.) Defendant Matthews ate, bathed, and watched television with other members of the family. He testified as to the programs he saw. According to Matthews, Victor Foust went out with Patricia at 10:00 p.m. to buy beer and returned shortly thereafter. Lawrence Matthews came home at 11:00 p.m. from his job at Fieldcrest Mills. Defendant Matthews stopped working at Fieldcrest in November and had been doing "part time" work since then. He was not working on February 11th.

Around 11:00 defendant Matthews and Lawrence went upstairs to bed. Shortly thereafter, Ronnie returned home and announced to them that he had been to Wilson with Charles Norfleet, Tyrone Dixon and "Boots." All three, defendant Matthews, Ronnie and Lawrence, then fell asleep. They were awakened later by the arrival of the police. When Sergeant Laughinghouse of the Wilson police asked Ronnie to go with him

---

1. On 1 December 1977, pursuant to G.S. 15A-931, the District Attorney dismissed the indictment charging Ronnie and Lawrence Matthews with the murder of Donald Mayo.

to the police station, defendant Matthews, Foust, and Lawrence also volunteered to go. Thereafter Foust changed his mind, but when the Sergeant asked, "Do you need any help?" he replied, "No, man, I'm coming," and the three went.

On direct examination, in response to specific questions from his counsel, defendant Matthews said that his hair was the same as it was on February 11th. "The scar on my nose was there then. It's right there. . . . I have been convicted of breaking and entering in 1971. I have not been convicted of anything else. I have a tattoo on my face. It is right there [left corner of his mouth]. I put it on when I was in prison in 1972. That was the breaking and entering thing I talked about." On cross-examination he said he "went to training school for not going to school."

Various members of defendant Matthews' family, including his grandparents, Annie and Thurman Matthews, confirmed his account. Mrs. Matthews, however, testified that Foust never volunteered to go to the police station. On the contrary, he refused to go until she told him "to go ahead, to keep down trouble."

In brief summary Victor Foust testified in his own behalf as follows:

The week before Christmas 1974 he had come to Greenville, the home of his family, from Washington, D. C., where he had been employed as a machinist. He worked for one employer two months and for another, seven and one-half months. On 11 February 1975 he was unemployed and, since the first week after New Year's, registered at the unemployment office in Greenville. He has never at any time been to a Spur station in Wilson. On February 11th he met Ronnie Matthews around 5:30 p.m. and solicited a ride to Ronnie's home in Ronnie's Cadillac. There, Victor watched television with his girl friend, Patricia Matthews. Around 10:00 p.m. they went out to the "Pak-A-Sak" and bought some malt liquor and soda. On the way back they saw one Marvin Adams, his wife, and an elderly woman. Pleasantries were exchanged, and Victor and Patricia returned to the Matthews' house, where they continued to watch television until the police arrived. Marvin Adams corroborated Foust's version of his encounter with him.

When the Sergeant asked the others if they would accompany him to the police station Foust volunteered to go too but then, he said, "[W]hen it dawned on me, you know, by past experience about the Greenville Police Department, I changed my mind." However, when the officers asked him if he "needed any help" he went along. His previous convictions had been for breach of peace, "disorderly conduct, you know, misdemeanors, a couple of traffic violations." Foust had a scar "right across [his] right eye and between [his] eyes," which he said he had had since he was 13 years old.

After "the people from Wilson" had viewed the group whom the officers had assembled, Foust was retained in jail overnight and was served with a warrant about 9:00 the next morning, Wednesday, February 12th. He was released on Saturday, February 15th. In March he was charged with the murder of Mayo and rearrested.

Ronnie Lee Matthews, 19 years of age, testified that although the title to the vehicle was in his mother's name he was the real owner of the green Cadillac with pink rug trim in the rear. On February 11th, between 5:00 and 6:00 p.m., he said he saw his first cousin, William Matthews, on the street and took him home. Thereafter, at the request of Charles Norfleet, Ronnie drove to Wilson with his friends, Robert Moore, Tyrone Dixon, and Charles Norfleet. They arrived around 8:30 p.m.; after being misdirected several times they went to a Spur station to get directions to Spruce Street. Charles Norfleet wanted to see a girl named Nell, who lived there. A fat man behind the counter gave them directions to Spruce Street. (According to Detective Broadwell Mr. Mayo "would weigh 400 pounds.") While at the station Ronnie Matthews bought a carton of orange juice. The others bought something to eat, and Tyrone Dixon and Charles Norfleet used the rest room.

The group left the station about 9:00 p.m. Although they found Spruce Street they could not find the home of Nell; so they returned to Greenville, arriving around 10:00 p.m. Ronnie Matthews let his friends out and went to visit his girl friend. Around 11:00 p.m. he, his girl friend, and Robert Moore drove to the Fieldcrest Mills to pick up James Dixon who was getting off work. Ronnie then went home. Neither William Matthews nor Vic-

tor Foust went with Ronnie to Wilson on the night of February 11th. His story was corroborated by Tyrone Dixon, Robert Moore, Charles Norfleet, James Dixon, Nell Pender, Phyllis Foreman (his girl friend), her sister, Lou Gail Foreman, and her boy friend, Melvin Roberson.

Lawrence Matthews testified that he worked two shifts at Fieldcrest Mills that day, getting off one hour early at 10:00 p.m. He took two friends home and then went to his own house. His story was confirmed by his supervisor, William Manning, several co-workers, and the guard at the mill.

As to both defendants, William Matthews and Victor Foust, the jury returned a verdict of guilty of murder in the first degree. Upon these verdicts, under the law then applicable, Judge Tillery entered the mandatory sentences of death. Defendants' appeal was not timely perfected. We allowed certiorari on 27 January 1976, and the appeal was docketed 18 June 1976.

*Attorney General Rufus Edmisten by Assistant Attorneys General Charles M. Hensey and Archie W. Anders for the State.*

*Bobby G. Abrams and Willis A. Talton for defendant appellant William Earl Matthews.*

*Vernon F. Daughtridge and Willis A. Talton for defendant appellant Vernon Victor Foust.*

SHARP, Chief Justice.

For our review defendants have submitted 14 questions comprising 60 separate assignments of error based upon 182 exceptions. No purpose would be served by discussing each of these assignments. With the gravity of the charge for which defendants stand convicted constantly in mind, we have carefully scrutinized the record and the multiplicity of alleged errors. We conclude that defendants have failed to show prejudicial error requiring a new trial.

[1] Defendants first contend that their conviction should be overturned because the trial judge refused to allow their motions for a change of venue or a special venire to be selected from a county other than Wilson. In support of these motions defendants assert only that the deceased victim, Mr. Donald E. Mayo, was a

member of a large family, well known throughout Wilson County, and that the Wilson Daily Times provided daily coverage of the first trial. For these reasons defendants assert it would be difficult to impanel twelve jurors who knew nothing about the victim or the case.

The decision whether to order a change of venue or a special venire rests in the discretion of the trial judge, and his decision will not be reversed except for gross abuse, such as the denial of a constitutional right. *State v. Boykin*, 291 N.C. 264, 229 S.E. 2d 914 (1976); *State v. Brower*, 289 N.C. 644, 224 S.E. 2d 551 (1976); *State v. Thompson*, 287 N.C. 303, 214 S.E. 2d 742 (1975), *death sentence vacated*, 428 U.S. 908, 49 L.Ed. 2d 1213, 96 S.Ct. 3215 (1976). In this case neither abuse of discretion nor prejudice has been shown. The record recites that defense counsel provided the court with the nine issues of the Wilson Daily Times which reported the events of the first trial. These papers are not a part of the record on appeal. Their absence, however, is immaterial since defendants say in their brief, "We do not contend that the articles in said newspaper were either inflammatory or biased."

We specifically reject as devoid of merit defendants' argument that news coverage which accurately reports the circumstances of the case and previous trial can be so "innately conducive to the inciting of local prejudices" as to require a change of venue. The fact that the defendants in this case were black and the victim white is mere happenstance; it is not per se grounds for a change of venue or special venire. Defendants made no attempt at trial, or prior thereto, to show that there existed in Wilson County any prejudice which might have deprived them of a fair and impartial jury, and the record suggests no such prejudice.

Defendants' second group of assignments involve the selection of the jury. *In limine*, we note that as of 2 July 1976 this appeal ceased to be one in "a death case." On that date, in *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct. 2978, the United States Supreme Court invalidated the death penalty provisions of N.C.G.S. 14-17 (Cum. Supp. 1975), the statute under which defendants were indicted, convicted and sentenced to death. Therefore, under the authority of 1973 N.C. Sess. Laws, ch. 1201, § 7 (2d Sess., 1974), a sentence of life imprisonment was

substituted in lieu of the death penalty imposed in this case. *State v. Young,* 291 N.C. 562, 231 S.E. 2d 577 (1977).

[2] Defendant first contends that the court erred in allowing the district attorney to challenge for cause 14 jurors, each of whom indicated that he was so opposed to capital punishment that regardless of the evidence, and even if convinced beyond a reasonable doubt that a defendant was guilty as charged, he would not return a verdict requiring the death sentence. Notwithstanding that on *voir dire* defendants did not request any further examination of the challenged jurors, defendants' contention now seems to be that had these jurors been further sifted by the judge he might have found them to be qualified under the rule laid down in *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968). This contention is totally without merit.

The decision in *Witherspoon* did not restrict the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to defendant's guilt. The ruling of the court was "that a *sentence of death* cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty. . . . No defendant can constitutionally be put to death at the hands of a tribunal so selected." (Emphasis added.) *Id.* at 522-23, 20 L.Ed. 2d at 784-85, 88 S.Ct. at 1777. Since each of the 14 challenged jurors declared his inability, no matter what the evidence, to render a verdict mandating the sentence of death, the 14 challenges were properly allowed. *State v. Davis,* 290 N.C. 511, 227 S.E. 2d 97 (1976).

*Witherspoon*-related errors in the selection of a jury affect only the sentence of death; they will not be held grounds for upsetting a conviction and ordering a new trial. 391 U.S. at 522, n. 21, 20 L.Ed. 2d at 785, 88 S.Ct. at 1777. *Accord, State v. Finch,* 293 N.C. 132, 235 S.E. 2d 819 (1977); *State v. Madden,* 292 N.C. 114, 232 S.E. 2d 656 (1977); *State v. Montgomery,* 291 N.C. 235, 229 S.E. 2d 904 (1976); *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976). As heretofore pointed out, this appeal involves only the validity of defendants' conviction—not the death sentence, for defendants cannot be put to death.

[3] It appears in the record from a statement by one of defendants' counsel that the State used its challenges "to remove all blacks who were called as potential jurors" with the exception of a "police officer who happened to be born black." Since defendants complain that the court allowed "these black defendants" to be tried by a jury composed entirely of white, presumably defendants excused the policeman. Defendants, of course, are not entitled to a new trial because all the jurors impaneled to try their case were white. A defendant is not entitled to be tried by a jury composed of a proportionate number of his own race, or even a jury on which his race is at all represented. He does, however, have the inviolable right to be tried by a fair and impartial jury, selected from a venire from which no members of any race have been systematically or arbitrarily excluded. *E.g., State v. Wright,* 290 N.C. 45, 224 S.E. 2d 624 (1976), *cert. denied,* 429 U.S. 1049, 50 L.Ed. 2d 765, 97 S.Ct. 760 (1977); *State v. Alford,* 289 N.C. 372, 222 S.E. 2d 222, *death sentence vacated,* 429 U.S. 809, 50 L.Ed. 2d 69, 97 S.Ct. 46 (1976); *State v. Spencer,* 276 N.C. 535, 173 S.E. 2d 765 (1970). Defendants in this case do not even suggest racial discrimination in the drawing and selection of either the jury lists or the traverse juries.

[4] At one point during the selection of the jury, the State had challenged five jurors, impliedly indicating its acceptance of the seven remaining in the box, and the court instructed the clerk to refill the empty seats. Before this could be done, however, juror No. 1 (Mrs. Ida Sherrod, who, as defendants inform us in their brief, is black) requested permission to ask a question. Mrs. Sherrod then declared, "I'm against capital punishment. I don't believe in killing. . . . I'm against capital punishment, and I want you to understand that." Mrs. Sherrod had been examined by the district attorney and, in response to a specific question, had told him she "felt she could serve" in a capital case. Upon reexamination Mrs. Sherrod said that she would "love to sit" on such a case and stated her views on capital punishment in such a way that they did not subject her to challenge for cause. The district attorney, however, "out of an abundance of precaution," exercised one of his peremptory challenges to excuse her. Defendant contends that the court erred in allowing the district attorney to reexamine, and then excuse, a venireman after indicating that she was satisfactory to the State. Defendant relies on the authority of

*State v. Fuller*, 114 N.C. 885, 19 S.E. 797 (1894). *Fuller* does indeed support defendants' position. That case, however, has been overruled by *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated*, 429 U.S. 912, 50 L.Ed. 2d 278, 97 S.Ct. 301 (1976). *McKenna* held that neither the case law nor N.C.G.S. 9-21(b) "prohibits the trial court, in the exercise of *its* discretion before the jury is impaneled, from allowing the State to challenge *peremptorily or for cause* a prospective juror previously accepted by the State and tendered to the defendant." *Id.* at 680, 224 S.E. 2d at 545. *See also State v. Harris*, 283 N.C. 46, 194 S.E. 2d 796 (1973), *cert. denied*, 414 U.S. 850, 38 L.Ed. 2d 99, 94 S.Ct. 143 (1974).

Defendants' remaining exceptions to the selection of the jury are without merit and are overruled.

As detailed in the preliminary statement of facts, at the completion of an extensive *voir dire* the trial court concluded that the State's witnesses Williams and Branch should be allowed to identify defendants Matthews and Foust in court, and that witness Ellis should be permitted to identify Matthews. The court found that the in-court identifications by these witnesses were independent of their pretrial confrontation with defendants at the Greenville police station, and that the earlier face-to-face encounter "was not so unnecessarily suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of fairness and justice." Eight of defendants' assignments of error challenge the admissibility of these in-court identifications. Defendants contend that at the time they "were subjected to a showup at the police station" they were actually under illegal arrest and had not been advised of their right to counsel. They also contend that "the totality of the circumstances" show that the witnesses' in-court identification was "tainted by the suggestive showup procedures."

Defendants first argue that, although at the time of the showup they "were not under arrest in the sense that formal charges had been preferred against either of them," they were actually in the custody of police officers. They insist that they had been taken from their homes without a warrant and without probable cause for arrest, the effect of this police action being an unconstitutional arrest which was also illegal under N.C. Gen. Stats.

15-41(2) (1965) (Repealed by 1973 N.C. Sess. Laws, c. 1286, § 26, effective July 1, 1975). However, all the evidence tends to show that defendant William Matthews, upon learning that his cousin Ronnie Matthews was going with the police officers to the station, actually volunteered to accompany him, and that defendant Foust—after some vacillation and upon his grandmother's advice—decided to accede to the officer's request and go with them. Even so, we need not explore in any detail the question whether defendants were under arrest at the time of the showup or whether the police had probable cause to make an arrest.

[5] Assuming, *arguendo*, that defendants were under illegal arrest at the time of the showup, the relevant consideration at this point is whether the arrest produced any evidence which must be suppressed as "the fruit of the poisonous tree" or " the fruit of official illegality." As the Court said in *United States v. Young*, 512 F. 2d 321, 323 (4th Cir. 1975), *cert. denied*, 424 U.S. 956, 47 L.Ed. 2d 362, 96 S.Ct. 1432 (1976). "It is only when the arrest itself produces such pressure as to compel admissions or the production of contraband or the seizing of evidence that would not otherwise have been detected that the poisonous tree can be said to produce fruit. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963)."

The only fruit of the challenged "arrest" in this case was the positive identification of defendants as two of the four men who participated in the robbery of Mayo's Spur station on the night of 11 February 1975. The penalty of exclusion, therefore, does not apply; for the Constitution protects no citizen from being viewed by the police or by other citizens at the invitation of the police. *United States v. Young, supra; United States v. Quarles*, 387 F. 2d 551 (4th Cir. 1967). *See also Yancey v. State*, 232 Ga. 167, 205 S.E. 2d 282 (1974).

In holding that the defendant had no right to avoid being viewed, the Court in *United States v. Quarles, supra*, also noted an admonition by the United States Supreme Court that the power to exclude identification evidence "is one that must be sparingly exercised, for the 'function of a criminal trial is to seek out and determine the truth or falsity of the charges brought against the defendant. Proper fulfillment of this function requires that, constitutional limitations aside, all relevant, competent

evidence be admissible, unless the manner in which it has been obtained . . . compels the formulation of a rule excluding its introduction in a federal court.' *Lopez v. United States*, 373 U.S. 427, 440, 83 S.Ct. 1381, 1388, 10 L.Ed. 2d 462 (1963). We feel no such compulsion here. *[Defendant] had no right that he not be viewed. United States v. Wade, supra*, 388 U.S. at 221, 87 S.Ct. at 1929, 18 L.Ed. 2d at 1154. A lineup is not the only means of identifying a suspect; an individual not in custody, as [defendant], 'may be placed under surveillance — he may be viewed on the streets, entering or leaving his home or place of business, at places of amusement, or at any other place where he is not entitled to privacy.' " *Id*. at 555-56. (Emphasis added.)

In affirming defendants' conviction in *United States v. Young, supra* at 323, the Court said, "We hold that an unlawful arrest does not per se make inadmissible positive identification testimony that is otherwise competent. *See Vance v. State of North Carolina*, 432 F. 2d 984, 990 (4th Cir. 1970). Whether such testimony is admissible does not depend upon the validity of the arrest but upon whether the confrontation was 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [appellants were] denied due process of law,' *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed. 2d 1199 (1967)."

Thus, so long as the circumstances were not unnecessarily suggestive, the police officers were free to arrange a confrontation between defendants (whether under arrest or not) and witnesses Williams, Branch, and Ellis. The fact that defendants were in custody only made the confrontation easier to arrange. Therefore, the questions remaining to be answered are (1) whether defendants were denied the right to counsel at the showup, and (2) whether the procedures used were so impermissibly suggestive as to be conducive to an irreparably mistaken identification.

[6] The question of defendants' right to counsel at the time of the showup is quickly resolved. Defendants mistakenly assume that they were entitled to have counsel present as soon as they were taken into custody as *suspects*. This is not the case. The right to counsel attaches upon the initiation of formal prosecution. Prosecution does not begin until a formal charge has been levied against a suspect by a judicial officer, whether by a finding of

probable cause, or by arraignment, indictment, information or preliminary hearing. Custodial arrest of a mere *suspect* does not constitute the initiation of "adversary judicial proceedings" and is not sufficient to draw the State and the prisoner into such an antagonistic relationship as to require the assistance of counsel from that moment forward. *Kirby v. Illinois*, 406 U.S. 682, 32 L.Ed. 2d 411, 92 S.Ct. 1877 (1972); *State v. Finch*, 293 N.C. 132, 235 S.E. 2d 819 (1977); *State v. Sweezy*, 291 N.C. 366, 230 S.E. 2d 524 (1976); *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974); *death sentence vacated*, 428 U.S. 902, 49 L.Ed. 2d 1205, 96 S.Ct. 3202 (1976); 1 Stansbury's N.C. Evidence § 57 (Brandis rev. 1973). *See also State v. Accor*, 277 N.C. 65, 175 S.E. 2d 583 (1970); N.C.G.S. 7A-451(b)(2) (Cum. Supp. 1977). Thus, our remaining inquiry into the identification procedures must focus upon the reliability of the pretrial confrontation.

Regardless of the presence of counsel, or whether formal judicial proceedings against the defendant have begun, the due process clause forbids an out-of-court confrontation which is so unnecessarily "suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 19 L.Ed. 2d 1247, 1253, 88 S.Ct. 967, 971 (1968); *State v. Sweezy, supra; State v. Williams*, 274 N.C. 328, 163 S.E. 2d 353 (1968). *See Stovall v. Denno*, 388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967 (1967). Thus, if a pretrial confrontation and identification fails the test of due process, an in-court identification will be excluded in both state and federal courts unless the prosecution can show at a *voir dire* hearing that the witness's in-court identification is independent of and untainted by the suggestive out-of-court confrontation. *State v. Colson*, 274 N.C. 295, 306, 163 S.E. 2d 376, 383-84 (1968), *cert. denied*, 393 U.S 1087, 21 L.Ed. 2d 780, 89 S.Ct. 876 (1969); *United States v. Wade*, 388 U.S. 218, 18 L.Ed. 2d 1149, 87 S.Ct. 1926 (1967). *See Neil v. Biggers*, 409 U.S. 188, 34 L.Ed. 2d 401, 93 S.Ct. 375 (1972); 1 Stansbury's N.C. Evidence § 57 (Brandis rev. 1973).

[7] As we pointed out in *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974), the use of a showup where other methods of identification are feasible has been widely condemned. The procedure in this case, like all showups, may have been inherently suggestive for the witnesses would likely assume that the police had brought them to view persons whom they suspected might be the

guilty parties. Further, Wiliams and Ellis knew that the officers had located the green Cadillac in which four black males came to the Spur station earlier in the evening, and that through this car, the police had traced the persons they were to view. Only Branch knew nothing about the Cadillac until after he had made his identification. However, as we have already noted, even if the out-of-court confrontation were impermissibly suggestive it will not render inadmissible the in-court identification provided it is first determined on *voir dire* that the in-court identification is of independent origin. *State v. Henderson, supra.*

In this case, all three witnesses saw the defendants at the Greenville police station within a few hours of the crime. Of the three; Williams was exposed to the most suggestion. He had seen the green Cadillac with pink trim in the back window when its four occupants had asked directions at Mayo's Spur station, and he again saw the car at the police station when he entered for the showup. It was also Williams, however, who had the best opportunity to observe the defendants. He observed them for several minutes at close quarters on two different occasions in a well-lighted room. On the second occasion he was no casual observer; the man he identified as Matthews came toward him, pulled a gun from his shirt, leaned against him, and pushed him into a corner so that he could not move. It was that same man whom Williams saw aim a gun across the counter at Mayo and whom he heard direct one of the other robbers to. shoot Mayo. It was also Matthews who ordered Williams to open the cash register and to whom he handed his wallet.

Although four men participated in the robbery, they entered in pairs at different times. It is noteworthy that Williams was able to identify only the two who entered first, Matthews and Foust. He identified them at the showup and he never thereafter expressed any doubt that they were two of the four culprits. Albeit Williams was sometimes an inarticulate witness — troubled by the rapid-fire questions and the objections of counsel, as well as the recollections of the nerve shattering events of 11 February 1975 — he stood by his identification of defendants Matthews and Foust. Moreover, he consistently refused to identify Ronnie and Lawrence Matthews because he could not be positive they had taken part in the robbery.

Witness Branch, who also identified the defendants as two of the men he saw in the Spur station, likewise observed them for several minutes while they were in a well-lighted room. In addition, he had seen Matthews' face caught in the full glare of the headlights of his car and had noted a scar on his face. Like Williams, however, he was unable to identify the other men who entered the station.

Witness Ellis had the least opportunity to observe the man he identified, defendant Matthews. Nevertheless, Ellis testified that when Matthews ran across the road in front of his car they were at such close quarters that Ellis would have hit Matthews had he not applied his brakes. Under similar circumstances the Supreme Court of the United States has held that reliable identification is possible. In *Coleman v. Alabama*, 399 U.S. 1, 26 L.Ed. 2d 387, 90 S.Ct. 1999 (1970), the witness was assaulted around 11:30 p.m. by three black men as he was changing his tire by the side of the road. As the car approached the scene, the three men fled across the road and were illuminated by the oncoming car's headlights. The witness in *Coleman* was able to give only a "vague" description to police before confronting defendants in a police lineup. Nonetheless, the Supreme Court held that there was no error in the trial court's findings that the in-court identification of the defendants by the witness was independent in origin from the pretrial confrontation.

Here, the trial court concluded that the in-court identification of both defendants by the witnesses Williams and Branch, and of defendant Matthews by the witness Ellis, was "independent in origin and not tainted by any illegal pretrial identification procedure." The court also concluded that the out-of-court identification procedure was not so suggestive as to give rise to a very substantial likelihood of misidentification. In our view, substantial evidence in the record supports these holdings, and we therefore uphold them on appeal. *E.g., State v. Tuggle*, 284 N.C. 515, 201 S.E. 2d 884 (1974); *State v. Morris*, 279 N.C. 477, 183 S.E. 2d 634 (1971).

[8] Defendants' assignments of error 26 and 27 assert that the trial judge erred in refusing defendants' motions for a transcript of the testimony of certain State's witnesses at the first trial. They contend these transcripts were needed to demonstrate

discrepancies in the witnesses' testimony. The first trial ended in a mistrial on 20 July 1975, thirty days before the commencement of the second trial, which we now review. The facts with reference to these motions are set out below.

This case was called for trial and the selection of the jury began on Monday, 18 August 1975. The jury was impaneled on Friday, August 22nd, and the verdict was returned on Thursday, August 28th. On the morning of August 22nd, Judge Tillery began the *voir dire* examination of State's witnesses Williams, Branch, and Ellis to determine the admissibility of their identification of defendants. After these witnesses had testified, defense counsel addressed the court as follows: "We would like to request that a transcript of the *voir dire* testimony of Mr. Bill Branch which was taken at the last trial be transcribed and admitted into evidence on this *voir dire* for the Court's consideration, and we do that because his testimony here today is in conflict with what he said at the last trial." Judge Tillery denied this motion. Whereupon defendants called as a witness Mrs. Margaret Deanhardt, the official court reporter for Wilson County who had reported defendants' first trial.

Mrs. Deanhardt, who had with her in court her notes and records of the first trial, testified that she "took down verbatim" what Bill Branch had said on *voir dire* at the first trial. At that time "he said he picked out all four of them. He stated he identified all four blacks in the Greenville police station as being the four that were at the Spur station . . . on the night this occurred." Finally, Mrs. Deanhardt testified that the witness Branch never made any in-court identification of anyone other than defendants Matthews and Foust; nor at the first trial did he mention having seen a green Cadillac in Wilson.

At the conclusion of Mrs. Deanhardt's testimony, which ended the *voir dire*, Judge Tillery dictated his findings of fact and conclusions of law. He then inquired of counsel if there were "any other pre-jury matters." At that time defendants renewed their motion "that they be furnished a transcript of the testimony of the State's witnesses Linwood Williams, Bill Branch, and Donald Ellis from the last trial of this action;" whereupon, the district attorney made "the same motion as to all 25 of [defendants'] witnesses at the last trial." The trial judge denied both motions, and we affirm his rulings.

State v. Matthews

At every retrial a transcript of the former trial would undoubtedly be a convenience and at least of some assistance to all parties. That does not mean, however, that either an indigent or a wealthy defendant has an unqualified right to a transcript or to demand it at any stage of trial. As pointed out in *Britt v. North Carolina*, 404 U.S. 226, 30 L.Ed. 2d 400, 92 S.Ct. 431 (1971), the crucial test in any case is whether the requested transcript is "needed for an effective defense or appeal," a rule first enunciated in *Griffin v. Illinois*, 351 U.S. 12, 100 L.Ed. 891, 76 S.Ct. 585 (1956). *See State v. McAllister*, 287 N.C. 178, 214 S.E. 2d 75 (1975). *See also McGarry v. Fogliani*, 370 F. 2d 42 (9th Cir. 1966); *United States v. Shoaf*, 341 F. 2d 832 (4th Cir. 1964). In *Britt*, the Supreme Court identified two factors relevant to the determination of need: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." 404 U.S. at 227, 30 L.Ed. 2d at 403-04, 92 S.Ct. at 434.

As in the case *sub judice, Britt* involved the retrial of a murder prosecution in eastern North Carolna only a month after the first trial had ended in a hung jury. In the interim the indigent defendant Britt had moved the court that the State be required to furnish him a free transcript of the first trial. The trial court denied the motion and the Supreme Court allowed certiorari to determine whether the rule of *Griffin v. Illinois, supra,* "applied in this context." The Court concluded that the rule did apply but that it had not been violated in Britt's case because, under the circumstances, "adequate alternatives to a transcript" were available. These circumstances included the fact that the second trial took place within a month of the first trial; that the second trial was before the same judge and with the same counsel; and that the same court reporter was present at both trials and could, at any time, have read back his notes of the mistrial to counsel.

Two factual differences are noted between Britt's case and this one: (1) Judge Tillery, who presided at the retrial, did not conduct the first trial. In our view, the fact that the same judge did not preside at both trials has no significance in this case. (2) On *voir dire* defendants Matthews and Foust called the court reporter as a witness and examined her with reference to the

testimony which State's witness Branch gave at the first trial. Albeit they did not see fit to call her again, the reporter was, of course, continuously present in court with her notes of the first trial, and defendants could have questioned her at any time, privately or before the judge or jury, with reference to the former testimony of any other witness as well.

We believe that the circumstances of the instant case disclose the availability of adequate alternatives to a transcript—alternatives more than equal to those in *Britt*—and that defendants here suffered no prejudice from the lack of a transcript. The record reveals that neither the district attorney nor counsel for the defense had a transcript of the former trial. The scales were not tipped in favor of the State on this count. We also note that defendants' request for the transcript came on the fifth day of the trial. At that time four days had been spent in selecting a jury and more than 400 persons—the original panel of prospective jurors and three special venires—had been summoned to court.

We hold that Judge Tillery did not abuse his discretion in denying defendants' motions. Assignments 26 and 27 are overruled.

The remainder of defendants' numerous assignments of error are without merit and do not warrant discussion. Suffice it to say, they concern matters within the discretionary control of the trial judge. Such rulings will not be reversed except for abuse of discretion. *E.g., State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537 (1976) (motion to set aside verdict, arguments of counsel); *State v. Waddell*, 289 N.C. 19, 220 S.E. 2d 293 (1975) (competency of jurors); *State v. Summers*, 284 N.C. 361, 200 S.E. 2d 808 (1973) (scope of allowable cross-examination). *See also State v. Rhodes*, 290 N.C. 16, 224 S.E. 2d 631 (1976) (matters not governed by rule or statute are left to the discretion of the trial judge); 12 Strong's N.C. Index 3d, *Trials* § 5. We have carefully examined each of the trial judge's challenged actions and can find no abuse. Having done so, we are constrained to remind counsel that the most effective appellate advocacy is not to be achieved by bringing forward multitudinous assignments of error based on indiscriminate exceptions; it is achieved only by careful selection of those exceptions relating to matters which, it might be reasonably argued,

amounted to denial of a substantial right or constituted error which affected the verdict. *See* 1 Strong's N.C. Index 3d, *Appeal and Error* § 47.

**[9]** Defendants' assignment No. 60 relates to the sentence of death which, as we have heretofore noted, was invalidated by *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed 2d 944, 96 S.Ct. 2978 (1976). Accordingly, following the decision of *State v. Davis*, 290 N.C. 511, 227 S.E. 2d 97 (1976), we remand this case to the Superior Court of Wilson County with directions (1) that the presiding judge, without requiring the presence of defendants, enter as to each defendant a judgment imposing life imprisonment for the first degree murder of which he has been convicted; and (2) that in accordance with these judgments the clerk of Superior Court of Wilson County issue commitments in substitution for the commitments heretofore issued. It is further ordered that the clerk furnish to each defendant and his attorney a copy of their judgment and commitment as revised in accordance with this opinion.

As to the verdicts — No error;

As to the judgments — Error and remanded.