**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Hugh Don SMITH, Defendant-Appellant.**

**No. 78–5447.**

United States Court of Appeals,
Fifth Circuit.

Oct. 31, 1979.

Jon B. Wood, Lafayette, Ga. (Court-appointed), Cliffe Lane Gort, Atlanta, Ga., for defendant-appellant.

C. Michael Abbott, Asst. U. S. Atty., Atlanta, Ga., Sara B. Criscitelli, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before WISDOM, AINSWORTH and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

Hugh Don Smith was indicted on 120 counts of receiving, transporting, and selling stolen motor vehicles, in violation of 18 U.S.C. §§ 2312, 2313, and 2. His first trial ended in a mistrial when the jury was unable to reach a verdict. On his second trial the jury convicted Smith of eighty counts. On appeal, Smith contends that the district court's refusal to give him a free, full transcript of the first trial violated his right to equal protection. He also complains he was prejudiced by the introduction into evidence of his guilty plea to a charge of prison escape and by the prosecutor's references during the trial to his past criminal record. Smith makes many other contentions.

We hold that the district court did not trench on Smith's right to equal protection. His indigency had nothing to do with the denial of his request for a transcript; the request came too late. We hold also that the introduction of the guilty plea was proper; the evidence was admissible to demonstrate the defendant's motive and plan for stealing the automobiles. Although several of the prosecutor's references to the defendant's criminal record were of doubtful propriety we find that, in the circumstances of this case, the references were harmless error.

I

The record consists of eighteen volumes. Its immensity compels us to review the facts and the defendant's assertions in more detail than is usually appropriate in an opinion on appeal, particularly when, as in this case, those facts bring relatively little law into play.

Hugh Don Smith was a wholesale dealer in used cars. He began in August 1976 as an employee of Jack Allen's Auto Discount, and soon opened his own business, Smith Auto Brokers, in Rome, Georgia. Smith's practice was to purchase used cars from suppliers, principally Professional Leasing Services and Frank Griffin Volkswagon, both of Jacksonville, Florida. He guaranteed payment by writing bank drafts. He would then sell the cars and use the proceeds of the sales to cover the drafts.

In May 1977, shortly after opening his own business, Smith pleaded guilty in state court to a charge of prison escape, for an incident that occurred several years before, and was sentenced to a year and a half imprisonment. The court allowed Smith to postpone his incarceration for three months, until the end of August, so he could put his affairs in order.

Smith was ingenious as he went about doing so. He parlayed an impending incarceration into a style of life embraced only by dreams of luxury. He bought expensive furniture for his home, a carrier to take the cars to market, and went on several gambling vacations. He cashed checks for $81,740 at the National City Bank of Rome, Georgia. Smith's scheme involved a variation on the standard practices he employed to avoid his creditors by seeking the sanctuary of prison later that summer. He received cars from suppliers, took possession of them signed bank drafts in exchange, and then, instead of covering the drafts with the proceeds of car sales, instructed his bank to dishonor the drafts. Since the drafts went unpaid, Smith could not obtain title to the cars, and so could not resell them in Georgia, a "title" state. But he could sell older cars in Alabama, since that state permits the sale of cars manufactured before 1975 with no more than a bill of sale. Smith sent pre-1975 cars to Anniston, Alabama, sold them at the Anniston Auto Auction, and pocketed the proceeds.

When his suppliers began to worry about receiving unpaid drafts, they tried to reach Smith. Usually he instructed his secretary to tell the callers he was out of town. When he answered the telephone he said he had overlooked the drafts, and asked his callers to redeposit the instruments. On July 31 Smith disconnected his telephone and closed his books, although he continued to accept cars, sign drafts, sell the cars in Alabama, and pocket the cash.

On August 9 Smith met with certain of his creditors to assure them all was well. He told Charles Strickland and others of Professional Leasing Services that legal expenses had made him unable to honor the drafts. He then rewrote and presented them with drafts already twice dishonored. Smith told those of his creditors who knew he faced an escape charge that he had requested to be put in a work release program. He neglected to tell them that shortly he would reside in the Rome City Jail.

Conscious that one who perpetrates fraud is not served by presence in prison, since creditors can follow lines of red ink, Smith approached an FBI agent to request federal immunity. He also sent for Ron Proud of Professional Leasing, offering to supply guidance for a civil suit against one of his own business partners in return for help in obtaining immunity.

At trial Smith denied that there was a scheme to defraud. He asserted that when he wrote his drafts he intended to pay them. He blamed his enormous debt on his principal supplier Charles Strickland of Professional Leasing Services. According to Smith, Strickland repeatedly sent him unsolicited cars, and when informed that Smith was unable to pay, encouraged him to sell the cars in Alabama and write the drafts to cover them. In addition, several defense witnesses testified that Smith tried to borrow money from them in 1977 to pay the drafts. Smith denied having asked Ron Proud of Professional Leasing Services to help him obtain immunity.

The jury found Smith guilty of eighty counts relating to twenty stolen motor vehicles. He was sentenced to four consecutive terms of five years each.[1]

II

Smith urges that the district court committed constitutional error when it refused to furnish him with a free, full transcript of his trial; he argues that this refusal was prejudicial to his defense in the second trial.

▆▆▆ An indigent defendant may not be deprived of "the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners". *Britt v. North Carolina,* 1971, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400, 403. The transcript of a prior mistrial is, of course, valuable help to the defense in preparing for trial and challenging discrepan-

---

1. Civil suits have also been initiated against Smith by those car dealers who were uninsured for their loss, and by the insurer of one who was insured to recover the money paid out by the company under the "trickery and fraud" provision of its policy.

cies in the testimony of prosecution witnesses. The Supreme Court has consistently recognized, therefore, that an indigent is entitled to a complete transcript free of charge without showing a particular need for the transcript. *See Britt* at 228, 92 S.Ct. 431; *Roberts v. LaVallee,* 1967, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41.[2]

■ Neither *Griffin v. Illinois,* 1956, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, nor any other case in the Supreme Court or in this circuit establishes, however, that the mere request for a transcript by an indigent imposes a constitutional duty on the trial court to order it prepared. Only "differences in access to the instruments needed to vindicate legal rights, *when based upon the financial situation of the defendant,* are repugnant to the Constitution". *Roberts,* 389 U.S. at 42, 88 S.Ct. at 196 (emphasis added). Examining the circumstances of Smith's request, we find that he was not unconstitutionally deprived of a transcript.

Smith's first trial ended on March 24, 1978. His second trial was scheduled to begin five weeks later. Smith's attorney made an informal oral request for the entire transcript of the first trial five days before the second trial was to begin.[3] The transcript covers eight days of testimony and runs to 1670 pages. The request was denied. During the second trial, after it had been continued for three days because of the defendant's illness, Smith's attorney renewed his request. The court again denied it, explaining that it was physically impossible to prepare a transcript of eight days of testimony without causing a further delay in the second trial. The court suggested instead that the court reporter make his notes of the first trial available, and transcribe specific portions at the defense

attorney's instructions. The defense expressed satisfaction with this arrangement. After Smith was convicted the court provided him with a full transcript of the first trial for use on appeal.

The reason the court denied the defendant's requests for a transcript is clear: properly enough, he did not want to postpone the second trial. Smith's attorney— who represented him at both trials—chose, for tactical or other reasons, to press his request for a transcript late in the game. He knew how long it would take for the transcript to be prepared. The government had asked for and received a portion of the transcript several weeks before the second trial. True, a copy of that portion could have been prepared for the defendant. But the district court was not made aware that the government had a part of the transcript, nor did the defense ask for a part rather than the whole. From the facts as they appeared to the district court, then, the price of granting the defendant's untimely request was postponement of the trial.

In a closely analogous case, we held that a trial court had discretion to refuse defense counsel's request for a continuance to have a transcript prepared at the defendant's own expense when the request was made on the eve of trial. *McKissick v. United States,* 5 Cir. 1967, 379 F.2d 754, 757. The district court has no less discretion to deny an indigent defendant's last minute request for a transcript.

■ Having concluded that the denial was not constitutionally infirm, we turn to the question of prejudice. A court of appeals will modify a district court's management of a trial only if the defendant suf-

**2.** An indigent defendant who contends that he was denied access to a transcript because of financial considerations must show on appeal that there were no alternative devices at the trial to fulfill the same functions as a transcript. *Britt,* 404 U.S. at 227, 92 S.Ct. 431. The government insists that, as in *Britt,* substantially equivalent substitutes for a transcript were made available to the defendant here. We do not reach this issue because we hold that in the circumstances of this case there was

no constitutional duty to grant a transcript in the first place.

**3.** Although the district court stated in his order that Smith requested the transcript on the Thursday or Friday immediately preceding the week set for the trial, Order, Oct. 19, 1978, the record reflects that the request was made on Wednesday. We must resolve this inconsistency in favor of the defendant.

fered prejudice from an abuse of the court's managerial discretion. *United States v. Henderson,* 5 Cir. 1979, 588 F.2d 157, 159, cert. denied 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794. This standard applies also to requests for legal services under 18 U.S.C. § 3006A, such as Smith's request for a transcript. *United States v. Sanders,* 9 Cir. 1972, 459 F.2d 1001, 1002.

The defendant points to two kinds of prejudice he says he suffered from the denial of the transcript, and offers three examples of the second kind. We shall discuss these briefly. The first kind of prejudice he complains of was an inability properly to prepare for the second trial, on the theory that the transcript contained important information. We fail to see, however, why Smith's attorney needed a *full* transcript to "discover" a case he had argued several weeks before. And we find it odd that were the transcript needed to prepare for the second trial, it was needed only days beforehand.

Second, Smith complains that, lacking a transcript, he was unable to impeach the testimony of two prosecution witnesses whose testimony, he argues, was inconsistent in a damaging way—exculpatory at the first trial and incriminating at the second. Putting aside the fact that the district court offered the defense the opportunity to have any portion of the transcript of the first trial, which ought to have permitted impeachment, and, examining the examples of inconsistency Smith proffers, we are unable to conclude that prejudice occurred.

The first asserted inconsistency involves the issue whether Smith voluntarily accepted the cars he received from Strickland. At the first trial the defense asked Strickland whether he ever sent Smith unsolicited cars. Strickland responded that from time to time he would ship Smith cars and only then inform Smith about the shipment. At the second trial the defense again asked Strickland whether he sent cars to Smith without consulting him, and Strickland responded that he did not. At this juncture, the defense asked that a transcript of Strickland's prior testimony on the issue be prepared and read to the jury. This was the only time the defense used the procedure the court offered. The court had the transcript prepared, cautioning the defense that it could not be read to the jury without giving Strickland an opportunity to explain his testimony. *See* Fed.R.Evid. 613(b). Strickland was recalled to the stand. He amplified his answer, explaining that he sent Smith several cars on consignment without having received a specific order. Smith's attorney then moved to another issue. Inexplicably, the defense failed to use the transcript it had requested, and chose not to pursue what it now assumed would have been a damaging line of questioning. We need not allow an alternative choice of tactics on appeal.

The second asserted inconsistency concerns Strickland's initial meeting with Smith. At the first trial Strickland said he met Smith in February or March 1977. Smith argues that the date is significant, that it tended to support the defense theory that Strickland sent Smith unsolicited cars before Smith pleaded guilty, hence before he could have hatched a scheme to defraud, one eye on his prison term. At the second trial, the defense argues, Strickland produced the "devastating" testimony that he first met Smith in May, after Smith was sentenced. The transcripts show, however, that Strickland's testimony did not differ from trial to trial. Strickland's mention of May, in context, refers to the date of a particular meeting of Smith, Strickland, and another, not his first meeting with Smith. Strickland said at the second trial that he first met Smith in February and began selling him cars in March.

The third asserted inconsistency occurred during the testimony of Lonnie Hodge, another of Smith's suppliers. At the first trial, Hodge said that he last saw Smith on August 12, 1977. At the second trial, he said that it was on August 9 that he last met with Smith. The government sought to prove with this testimony that Smith was not in communication with Hodge after the drafts Smith wrote started being returned unpaid. The impact of this testimony re-

mained the same no matter which date was correct, since the drafts written to Hodge were dishonored after August 12. Hodge admitted at both trials that correctly remembering dates was not his forte. We agree with the government that this seeming conflict was not prejudicial; impeachment would have added little since Hodge admitted that his earlier testimony may have differed.

In sum, we find that Smith was denied a transcript because of dilatoriness, not indigency, and that the denial did not seriously prejudice his case.

### III

Smith next objects to the prosecution's reference during the second trial to his criminal record. In his opening statement, the prosecutor remarked that Smith began in the car business in August 1976 after his release from prison. The prosecutor then referred to Smith's guilty plea, and linked Smith's upcoming prison term to his alleged used car fraud. The prosecutor also referred to Smith's criminal record in his direct case: he asked nine witnesses whether the defendant had told them of his plea and that he was scheduled to go to jail in August. After each answered "No", he asked them if they were "ever told anything about whether or not Smith had a criminal record". Again, they responded negatively. The prosecution also introduced documentary evidence of the defendant's plea and sentence.

Smith objected to the prosecutor's opening remarks, to the line of questioning, and to the documentary evidence. The court denied Smith's motion for a second mistrial, made after the opening remarks. And at the trial's close, noting that Smith chose to testify and that evidence of an extensive criminal background was admitted to impeach, the court concluded that the prosecutor's opening remark was harmless, and that the other evidence of the guilty plea and sentence was admissible to demonstrate Smith's intent.

Smith asserts that he took the stand at his second trial only to mitigate the prosecutor's revelations, and that the impeachment and his own evidence of his prior record does not render the prosecutor's remarks harmless. Smith argues that all references to his prior record were absent from the government's case in his first trial. He concludes that the prosecutor was "waiving [waving] the bloody shirt", and that his statements must have been prejudicial since the jury reached a verdict in the second trial, which it could not do in the first.

We reject this argument. We agree with the district court that the evidence of Smith's guilty plea and sentence was properly admitted, and that the improper reference to Smith's criminal past during the prosecutor's opening statement was harmless. The reference—that Smith began dealing in used cars after his release from jail—was improper. The government explains that it was inadvertent, and suggests that the prosecutor made the remark in an attempt to put the defendant's business activities in the proper time frame. We accept the government's explanation that the remark was inadvertent. We conclude that it was harmless in the circumstances of this case. We caution the government, however, that comments of this nature are unprofessional at best and will be scrutinized on appeal.

The introduction of documentary evidence of Smith's plea and sentence, and the prosecutor's reference to them while questioning witnesses was not improper. The Federal Rules permit the use of prior conviction evidence to demonstrate "motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident". Fed.R.Evid. 404(b). In United States v. Beechum, 5 Cir. 1978, 582 F.2d 898, 911 (en banc), cert. denied 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472, we said that this rule calls for a two step test. The court must determine whether the conviction is relevant to an issue other than the defendant's character. The court must then decide whether the probative value of the evidence substantially outweighs the danger of prejudice to the defendant.

The only important contested issue in this case was whether Smith took the cars from his suppliers with the intent not to pay for them. Smith had insisted through his first trial that he did not set out to dishonor the drafts he wrote. Anticipating that Smith would testify the same way the second time around the government offered proof that he intended all along to receive cars without paying for them, sell them, hide or spend the cash, and seek refuge in jail from his creditors. A crucial element of the plan was the impending prison term. The government, therefore, sought to establish the scheme by introducing Smith's plea and sentence. The government also elicited from prosecution witnesses that Smith never informed his suppliers that he was shortly embarking on a prison term. We agree with the government that this evidence was properly introduced to show both the defendant's motive and his plan. And we hold it harmless error that the district court relied on the wrong theory, admitting the evidence to demonstrate intent rather than motive and plan. *United States v. Evans,* 5 Cir. 1978, 572 F.2d 455, 488, *cert. denied* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182.

That Smith was sentenced to jail for prison escape was, moreover, gone into thoroughly during the defendant's first trial. Smith had no objection to the use of this evidence at that trial. On the contrary, he attempted to show at *both* trials that Strickland and other suppliers knew about the guilty plea and were aware Smith might go to jail. We think there was thus little danger of prejudice from the introduction of this evidence. The district court was careful to alleviate, by precise limiting instructions, whatever prejudice the evidence might have produced.[4]

■ Finally, we cannot accept the argument that Smith took the stand only to mitigate the prosecutor's comments. Smith *had* to take the stand in the second trial to set out his defensive theory. Moreover, he had taken the stand at his first trial, reviewed every aspect of his criminal record in direct testimony, and was cross-examined on the subject. When Smith's attorney objected at the second trial to the introduction of Smith's criminal record, he did not state that the defendant would not testify and that the record was therefore inadmissible. Rather he objected to the premature introduction of the record. Indeed, the bulk of Smith's testimony at his second trial—68 pages in the record—sought not to explain his criminal history but to set out the defense theory that Smith was the victim of a snowballing indebtedness engineered by Strickland. The defendant's testimony at both trials refutes his claim he took the stand only to dissipate the effects of the prosecutor's statements.

## IV

■ Smith contends that the district court erred in refusing to allow him to impeach Strickland with the testimony of Debbie Canada, Smith's secretary. Strickland testified he had once telephoned Canada to request that the odometer of an automobile be turned back, stressing the uniqueness of this request. The defendant called Canada to testify that Strickland often requested her to tamper with odometers.

The district court correctly refused to allow the impeachment; Strickland's acts were collateral in this trial. The Federal Rules provide that extrinsic evidence of specific conduct may be introduced bearing on credibility only when it concerns prior convictions. Fed.R.Evid. 608(b). *See United States v. Herzberg,* 5 Cir. 1977, 558 F.2d

---

4. We find no merit in Smith's remaining criticisms of the prosecutor's conduct of this case. He complains, for the first time on appeal, that the prosecutor impermissibly suggested that the defendant was accorded special privileges in the Rome City Jail. Upon the defendant's objection that this question lacked a proper foundation the question was withdrawn. Smith also asserts that the prosecutor asked

Smith's former banker whether the bank had terminated its relationship with the defendant when it learned of Smith's reputation. The witness denied this allegation, however, in an answer that was extremely favorable to the defense. Moreover, the trial judge reprimanded the prosecutor before the jury, instructing it to ignore this question entirely.

1219, 1223–24, *cert. denied* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290; *United States v. Bell,* 5 Cir. 1975, 510 F.2d 1095.

Contrary to Smith's assertions, Ms. Canada's testimony is not admissible under Rule 613(b) of the Federal Rules. That rule permits impeachment by prior inconsistent statements. The defense sought to show not that Strickland uttered a prior inconsistent statement, but rather that Strickland acted in a manner contrary to his trial testimony. The Advisory Committee Notes to Rule 613 spell out clearly that the rule does not cover "impeachment by evidence of prior inconsistent conduct".

## V

In its reply brief, the defense described the effect of the prosecutor's remarks in the words of Omar Khayyam:

The Moving Finger writes; and having writ,
Moves on: nor all your Piety nor wit
Shall lure it back to cancel half a line,
Nor all your tears wash out a word of it.

Rubaiyat, Stanza 71. The moving finger, however, sped past another line:

Ah, Take the Cash and let the Credit go
. . .

Rubaiyat, Stanza 13.

The appellant's conviction is AFFIRMED.