IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-102

No. 306A21

Filed 19 August 2022

STATE OF NORTH CAROLINA

v.

RICHARD ALAN GADDIS, JR.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 278 N.C. App. 524, 2021-NCCOA-351, finding no error in the jury's verdicts or in the judgments entered on 6 September 2019 by Judge Jeffery K. Carpenter in Superior Court, Union County. Heard in the Supreme Court on 10 May 2022.

*Joshua H. Stein, Attorney General, by Michael T. Henry, Assistant Attorney General, for the State-appellee.*

*Jarvis John Edgerton IV for defendant-appellant.*

BERGER, Justice.

¶ 1     Following a mistrial, defendant was convicted by a jury of driving while impaired, driving while his license was revoked for an impaired driving offense, driving without a valid registration, and driving without a displayed license plate. Based upon a dissent in the Court of Appeals, the issue before this Court is whether the Court of Appeals erred in determining that the trial court correctly denied

defendant's motion for a transcript of a prior trial and motion to continue. For the reasons stated below, we affirm the decision of the Court of Appeals.

## I. Factual and Procedural Background

On February 12, 2018, defendant was charged with multiple driving offenses stemming from impaired driving. Defendant was found to be indigent, and Onyema Ezeh was appointed as counsel. Defendant's first trial in Superior Court, Union County, began on July 15, 2019. The jury was deadlocked eleven to one, and the trial court declared a mistrial. Ezeh was allowed to withdraw as counsel for defendant, and Peter Dwyer was appointed as new counsel. The case was re-calendared for September 3, 2019.

On August 26, 2019, approximately one week before trial and over five weeks after Mr. Dwyer was appointed as counsel, defendant filed a "Motion for Transcript" seeking to obtain a free transcript of the previous trial. Defendant also appears to have requested in open court that his trial be continued.[1] The trial court appears to have summarily denied defendant's motion for a transcript and corresponding motion to continue.

On the day of trial, defendant submitted a renewed motion for a transcript and a renewed motion to continue, arguing that the denial of each would be a "violation

---

[1] Although defendant's motion for transcript appears in writing in the record, a motion to continue does not. It appears that defense counsel requested a continuance in open court on August 26, 2019, but there is no transcript in the record for such a hearing.

of [d]efendant['s] right to fundamental fairness and due process of law guaranteed by" both the United States Constitution and the North Carolina State Constitution. The trial court again denied both motions, and the case proceeded to trial.

¶ 5        At defendant's second trial, the evidence tended to show that on the evening of February 12, 2018, Bryan Porcello was driving with his family on Idlewild Road in Union County. Porcello observed a white truck ahead of him travelling in the same direction swerve several times into oncoming traffic and travel through several traffic signals that were emitting a solid red light. Porcello called law enforcement and followed the white truck.

¶ 6        Porcello testified that he observed the driver of the truck attempt to drive around other vehicles stopped at a traffic signal and become stuck on the right-hand shoulder of the road. At that point, Porcello drove past the truck. Shortly thereafter, Porcello decided to turn around to ensure the driver was no longer operating the vehicle and that law enforcement had responded to the scene. However, the driver managed to get off the shoulder and drive away, and soon crossed Porcello's direction of travel.

¶ 7        Porcello turned his vehicle around and followed the truck again. The driver of the truck continued to operate the vehicle erratically for some time until Porcello witnessed the truck travel off the right shoulder of the road, overcorrect, and "sho[o]t across both lanes and wreck into a ditch" off the left side of the road. Porcello testified

that he observed a "white male" driving the vehicle and did not see anyone else in the vehicle.

¶ 8        Porcello responded to the crash, but conditions had become too dark to allow Porcello to see clearly into the truck, and he flagged down another driver, David Daniel, for assistance. Porcello testified that he always "kept [his] eye" on the vehicle and did not observe anyone exit the white truck. Daniel stated that as he approached the wrecked truck, the headlights from Daniel's vehicle helped illuminate the scene. Daniel observed defendant sitting alone in the driver seat of the wrecked truck. When Porcello and Daniel approached the truck with a flashlight, the two men saw defendant sitting in the front seat revving the engine. Defendant was disoriented, his speech was slurred, and his breath smelled strongly of alcohol. Defendant eventually exited the vehicle and stumbled down the road in an attempt to flee the scene.

¶ 9        At first, Porcello and Daniel followed defendant on foot. While Daniel remained on foot behind defendant, Porcello eventually went back to the scene of the accident and retrieved Daniel's vehicle in order to drive along the side of the road to ensure he and Daniel did not lose sight of defendant.

¶ 10        Defendant verbally threatened and charged at Daniel several times. In response, Daniel drew his handgun and fired a warning shot into the ground to keep defendant at bay. When defendant began to head toward a nearby house, Porcello

got out of the truck and helped Daniel subdue defendant. The two men held defendant on the ground until law enforcement arrived.

¶ 11 Defendant was handcuffed and placed in the back of a patrol car when officers arrived. Defendant became violent and attempted to kick his way out of the patrol car. Officers removed defendant from the first patrol car and moved him to a different vehicle where he had to be shackled to the floor. In-car camera footage recorded defendant admitting that he owned the wrecked truck and had been driving. Defendant failed to perform field sobriety tests to officers' satisfaction, and a search warrant was obtained to draw a blood sample from defendant. Testing showed defendant's blood alcohol concentration was .12 grams of alcohol per 100 milliliters.

¶ 12 The jury found defendant guilty of all charges, and he timely appealed to the Court of Appeals. The Court of Appeals determined that defendant received a fair trial free from prejudicial error. *State v. Gaddis*, 278 N.C. App. 524, 2021-NCCOA-351, ¶ 17. Defendant appeals to this Court arguing that the trial court erred in denying defendant's motion for a transcript and motion to continue.

¶ 13 Defendant contends that the trial court's denials of his motions violated his equal protection and due process rights under *Britt v. North Carolina*, 404 U.S. 226 (1971), and *State v. Rankin*, 306 N.C. 712 (1982). Specifically, defendant argues that the trial court's denial of his requests for a transcript prevented him from properly impeaching the State's witnesses on their identification of defendant as the operator

of the vehicle. Although we agree that the trial court likely erred in failing to apply the two-part *Britt* test upon defendant's requests for a transcript of the previous proceeding, we conclude that this error was harmless beyond a reasonable doubt.

## II. Analysis

¶ 14 "At every retrial a transcript of the former trial would undoubtedly be a convenience and at least of some assistance to all parties." *State v. Matthews*, 295 N.C. 265, 289, 245 S.E.2d 727, 741 (1978). "[E]ven in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses." *Britt*, 404 U.S. at 228, 92 S. Ct. at 434.

¶ 15 However, a defendant does not have "an unqualified right to a transcript or to demand it at any stage of trial." *Matthews*, 295 N.C. at 289, 245 S.E.2d at 741. Neither the Supreme Court of the United States nor this Court have suggested that "the mere request for a transcript by an indigent imposes a constitutional duty on the trial court to order it prepared." *United States v. Smith*, 605 F.2d 839, 843 (5th Cir. 1979). For example, a trial court may consider such motions untimely if they are made at the last minute or "late in the game." *Id.*

¶ 16 In *Britt*, the Supreme Court outlined the following test to determine whether the State must provide an indigent defendant with a free transcript, requiring trial

courts to consider: (1) "the value of the transcript to the defendant in connection with the appeal or trial for which it is sought"; and (2) "the availability of alternative devices that would fulfill the same functions as a transcript." *Britt*, 404 U.S. at 227, 92 S. Ct. at 433–34. Pursuant to *Britt*, resolution of the second factor is ultimately a "determination of need." *Id.* at 228, 92 S. Ct. at 434; *see also Matthews*, 295 N.C. at 289, 245 S.E.2d at 741 ("[T]he crucial test in any case is whether the requested transcript is 'needed for an effective defense or appeal,' a rule first enunciated in *Griffin v. Illinois*, 351 U.S. 12, 76 S. Ct. 585, 100 L. Ed. 891 (1956).").

¶ 17       In *Rankin*, we held that because "there was no alternative available to the defendant which was substantially equivalent to a transcript, the defendant was entitled to a free transcript and therefore its denial was error." *Rankin*, 306 N.C. at 717, 295 S.E.2d at 420 (1982).

¶ 18       Determination of whether a trial court erred in denying a defendant's motion for a transcript is ordinarily reviewed for abuse of discretion. *Matthews*, 295 N.C. at 290, 245 S.E.2d at 742; *see also United States v. Smith*, 605 F.2d 839, 843 (5th Cir. 1979) (holding that it was within the trial court's "discretion to deny an indigent defendant's last minute request for a transcript" when the reason for the denial was an unnecessary delay of the trial).

> If the motion raises a constitutional issue, the trial court's action upon it involves a question of law which is fully reviewable by an examination of the particular circumstances of each case. However, regardless of the

> nature of the motion . . . whether constitutional or not, a
> denial of a motion to continue is grounds for a new trial
> only upon a showing by the defendant that the denial was
> erroneous and that his case was prejudiced thereby.

State v. Johnson, 379 N.C. 629, 2021-NCSC-165, ¶ 14 (cleaned up).

¶ 19    Here, the trial court denied defendant's motions for a transcript of the earlier trial. Neither the record nor the transcript of the subsequent proceedings indicate that the trial court considered the *Britt* test in denying defendant's request, making appellate review difficult. However, even if we assume that the trial court erred in denying defendant's motions for a trial transcript, the error was harmless beyond a reasonable doubt.

¶ 20    "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt." N.C.G.S. § 15A-1443(b) (2021); *see also State v. Lawrence*, 365 N.C. 506, 512–13, 723 S.E.2d 326, 330–31 (2012). "[A]n error under the United States Constitution will be held harmless if the jury verdict would have been the same absent the error." *Lawrence*, 365 N.C. at 513, 723 S.E.2d at 331 (cleaned up). When a violation is alleged under the federal constitution, the Court must determine whether it was harmless beyond a reasonable doubt. *See id.*

¶ 21    "The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . ." *State v. Malachi*, 371 N.C. 719, 734, 821 S.E.2d 407, 418 (2018) (quoting *Rose*

*v. Clark*, 478 U.S. 570, 577, 106 S. Ct. 3101, 3105 (1986)). "The presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt." *State v. Bunch*, 363 N.C. 841, 845–46, 689 S.E.2d 866, 869 (2010) (cleaned up) (holding that the trial court's failure to properly instruct the jury in a homicide trial on felony murder was harmless error and "[t]he foundation on which defendant bases [ ]his argument is superficial in light of the overwhelming evidence that defendant caused the victim's death"). The State bears the burden of demonstrating that the error was harmless beyond a reasonable doubt. *Lawrence*, 365 N.C. at 513, 723 S.E.2d at 331; N.C.G.S. § 15A-1443(b).

¶ 22        The jury's guilty verdicts here are supported by overwhelming evidence. Defendant was captured on video admitting that he was the operator of the vehicle when it wrecked. At a minimum, the evidence at trial showed that defendant was involved in a single-vehicle accident. Daniel and Porcello responded to the accident, where they saw defendant sitting in the vehicle, revving the engine. Daniel and Porcello were ultimately able to detain defendant until law enforcement arrived at the scene. Defendant was handcuffed and arrested by law enforcement. At trial, Deputy James Murray and Sergeant Frank Hearne identified defendant as the individual detained at the scene. A search warrant was issued for officers to obtain a blood sample, which revealed defendant's blood alcohol concentration of .12 grams per 100 milliliters, well above the legal limit of .08.

Even if the trial court had ordered production of the transcript, "the jury verdict would have been the same." *Lawrence*, 365 N.C. at 513, 723 S.E.2d at 331 (quoting *Neder v. United States*, 527 U.S. 1, 17, 119 S. Ct. 1827, 1837 (1999)). Even if defendant had the transcript of the prior trial to impeach the testimony of Porcello and Daniel, there still existed overwhelming evidence of defendant's guilt. The trial court allowed defendant's counsel to call defendant's former counsel, Ezeh, as an impeachment witness. Although able to impeach Porcello's testimony regarding his identification of defendant as the driver of the wrecked truck at the first trial, Ezeh could not, and did not, impeach Daniel's testimony. There is no indication that Daniel made any inconsistent statements.

Officers identified defendant as the individual they arrested at the scene of the accident who had been detained by Porcello and Daniel. After being placed in a patrol unit, defendant admitted that he was the driver of the vehicle when it was wrecked. This admission was captured on video and shown to the jury. A search warrant was obtained to draw defendant's blood, and the sample obtained from defendant indicated that his blood alcohol concentration was above the legal limit. Thus, any error was harmless beyond a reasonable doubt.

### III. Conclusion

For the foregoing reasons, the State met its burden to prove that the error in question was harmless beyond a reasonable doubt, and we affirm the decision of the

Court of Appeals.

AFFIRMED.

Justice EARLS dissenting.

Affording equal protection and due process to all defendants, whether rich or poor, "is an age-old problem," but "[p]eople have never ceased to hope and strive to move closer to that goal." *Griffin v. Illinois*, 351 U.S. 12, 16 (1956). With *Griffin,* which established that "[d]estitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts," our criminal system moved closer to that goal. *Id.* at 19. With *Britt v. North Carolina*, which established that "the State must provide an indigent defendant with a transcript of prior proceedings when the transcript is needed for an effective defense or appeal," we moved closer still. 404 U.S. 226, 227 (1971). Unfortunately, the majority chooses to walk away from that goal in this case due to its unfounded confidence in this defendant's guilt.

This case concerns an indigent defendant, Richard Gaddis, who was charged with various driving-related offenses. The State's case against him relied heavily on the testimony of witnesses who encountered Gaddis after a vehicle he was travelling in crashed on the side of a road. The first trial ended in a mistrial due to a hung jury. Before his second trial—and anticipating that the State would once again elicit testimony from those same witnesses—Gaddis's attorney filed a motion seeking a transcript of the first trial and a continuance to allow sufficient time for its production. Gaddis's attorney hoped to use the transcript to highlight inconsistencies

in the witnesses' testimony and impeach their credibility. The trial court denied this request. Gaddis was ultimately convicted.

¶ 28 A wealthier defendant would not have needed to involve the trial court in his or her effort to obtain a transcript. A wealthier defendant could simply have placed a standing order with the court reporter to receive daily copies of the transcript of the trial proceedings. Accordingly, as established in *Griffin* and *Britt*, the trial court's actions implicated Gaddis's constitutional rights. To determine if Gaddis's constitutional rights were violated in a manner warranting reversal, this Court must answer two questions: First, was the transcript of the first trial necessary to Gaddis's defense at his second trial? And second, if the trial court did violate Gaddis's constitutional rights by failing to provide him with a transcript of the first trial, was the error harmless beyond a reasonable doubt? *See Britt*, 404 U.S. at 227.

¶ 29 The majority addresses only the second question, concluding that "even if . . . the trial court erred in denying defendant's motions for a trial transcript, the error was harmless beyond a reasonable doubt." *Ante*, at ¶ 19. This conclusion is based on the majority's view that the evidence against Gaddis was "overwhelming." *Id.*, at ¶ 22. This conclusion is not supported by the record; indeed, a jury presented with substantially the same evidence as presented at the second trial failed to convict Gaddis during his initial trial. If Gaddis had been provided access to a transcript or something substantially similar in advance of his second trial, there is a reasonable

chance the outcome of his trial would have been different. Therefore, the trial court's denial of Gaddis's motion violated his constitutional rights, and that violation was not harmless beyond a reasonable doubt. I respectfully dissent.

## I.    Background

On 12 February 2018, Richard Alan Gaddis Jr. was charged with driving while impaired, driving with a revoked license, driving without a registration, and driving without a displayed license plate. That night, Bryan Porcello, a witness who would later testify for the State, saw a white utility truck driving erratically before crashing into a ditch. According to Porcello and another witness, David Daniel, Gaddis emerged from the truck exhibiting signs of intoxication. The witnesses followed Gaddis into a residential neighborhood, where they subdued him and waited for the police.

The police arrived roughly twenty minutes later. Their interactions with Gaddis were recorded on an officer's dashboard camera. In that recording, Gaddis can be heard admitting to drinking but denying that he had been driving the truck. When asked who was driving, he stated "[n]ot sure." However, later on in the police officer's questioning, Gaddis said, "Man, you know all that [expletive]. Now if you're going to blow smoke up my ass, I'm going to blow smoke up yours. We can go through this all day. Look here dude, that's my truck, I've been driving the mother-[expletive]." Gaddis subsequently failed a field sobriety test, claimed once again that he was not

the driver, and refused to submit to a roadside breath test. A subsequent blood draw revealed a blood alcohol concentration of .12 grams per 100 milliliters, which is above the legal limit. The vehicle identification number associated with the crashed truck indicated the truck belonged to a woman living in Charlotte.

¶ 32    Gaddis was first tried on 15 July 2019. The trial ended in a mistrial due to a hung jury. After the mistrial, Gaddis's attorney, Onyema Ezeh, withdrew as counsel. On 18 July 2019, a new attorney, Peter Dwyer, was appointed as Gaddis's counsel. Dwyer received discovery on 19 August 2019. A new trial was set for 3 September 2019.

¶ 33    On 26 August 2019, Dwyer filed a motion for transcript and a motion to continue so that a transcript from the mistrial could be provided. He asserted that "[d]efendant will need the transcript of the superior court trial showing the testimony of the witnesses from that trial in order to be properly prepared for the re-trial of this matter." In a colloquy, Dwyer emphasized his client's need for a transcript. His concern was that when cross-examining the State's witnesses, he would not be able to "stick them to" what they said at the first trial.

> But I just believe that without seeing the testimony of the two eyewitnesses and what they stated at the prior trial and my inability to impeach them when we do try this case is so critical. And like I said, looking at . . . the information Ezeh had given me, speaking with my client, I think there was good testimony that would benefit me but their testimony when they come back to trial could change substantially. And like I said, I can say didn't you say at

> the prior trial and they're going to be able to go I don't think I did, I don't recall, no I didn't. And I have no way to pull something out and say yes you did, this is what you stated, this is the questions you were asked at the prior trial, this is the answer you gave, why is your testimony today different. And if they get up there and testify differently.

Dwyer also argued that because the State's attorney was present at the prior trial, Gaddis would be disadvantaged by having counsel who had not heard the arguments and testimony presented at the prior trial. The same day that the motions were filed, the court issued a joint order denying Gaddis's motion for transcript and motion to continue. The trial court did not enter any findings of fact related to Gaddis's need for a transcript.

¶ 34        On 3 September 2019, the morning of the retrial, Dwyer filed a second pretrial motion to continue so that a transcript could be provided. In this renewed motion, Dwyer argued that:

> In reviewing the file, I only see a statement from one [of] two alleged eyewitness[es]. It would be critical to this case to ascertain the testimony of all [of] the witnesses for impeachment purposes but especially the testimony of a witness where no recorded statement or written statement was taken. This case hinges on the testimony of those two eyewitnesses trying to provide testimony to indicate that Defendant was the driver of the truck. The ability to impeach these witnesses with their prior sworn testimony and discredit them <u>is absolutely critical in this case</u>.
>
> Without [the] prior transcript, I have no way of impeaching any witness who testified at the prior trial without a copy of the prior transcript, never mind even knowing exactly how they testified.

> In addition, the [S]tate has the unfair advantage of
> changing their strategy on the retrial of this matter based
> on prior testimony of the witnesses whereas I not being the
> attorney of record at the previous trial do not accurately
> know the testimony of any of the witnesses.
>
> In reviewing the file, the [S]tate obtained an order on [18
> July 2019] and may have sent out juror questionnaires and
> will have the advantage of tailoring their case based on the
> replies if any from the jurors at the prior trial, while I have
> no transcript of the trial itself to review.

Dwyer also argued that his delay in requesting the transcript until a week before the
trial was not a tactic but was actually the result of him not having a chance to review
the case until 19 August 2019, when he returned from leave and first received
discovery. Nevertheless, the court again denied Gaddis's motion to continue. It made
no written findings but found orally:

> The alleged date of offense is February 12th, 2018. The
> Defendant was taken into custody on February 12th, 2018.
> He was appointed counsel on February 14th, 2018, that
> being Vernon Cloud. Mr. Cloud represented Mr. Gaddis up
> until the time he withdrew in October of — on October 9th,
> 2018. At which time Tiffany Wilson was appointed outright
> to represent Mr. Gaddis. Ms. Wilson represented Mr.
> Gaddis from October 9th, 2018 until December 10th, 2018,
> at which time she withdrew and Mr. Ezeh was appointed
> outright to represent Mr. Gaddis. That representation
> began December 10th, 2018 and continued through July
> 18th, 2019, which included the last trial of this matter. At
> which time Mr. Ezeh was allowed to withdraw and Mr.
> Dwyer was appointed outright to represent Mr. Gaddis and
> represents Mr. Gaddis here today September 3rd. So we've
> been through three prior attorneys prior to getting to you,
> Mr. Dwyer.

The case proceeded to trial.

¶ 35          The State called Porcello and Daniel, the witnesses who first arrived at the

scene of the crash, to testify in both trials. At the retrial, Porcello testified that on 12

February 2018, at around 7:30 p.m., he observed a white work truck swerving from

lane to lane, running several red lights, and crashing in a ditch. Porcello testified

that, as he drove past the crash he saw "a white male" alone in the truck. Porcello

then returned to the crash to see if the driver was hurt. By this time, "it was starting

to get even darker and [Porcello] couldn't see in the vehicle." Porcello flagged down a

second individual, Daniel, to help. Using Daniel's flashlight, Porcello testified that he

was able to see Gaddis in the driver's seat as Porcello and Daniel approached. At some

point, Gaddis emerged from the truck, and he "ask[ed] where some female was" two

or three times.

¶ 36          The State next called on Daniel, who testified that he

> pulled up just as the utility truck had come to a rest in the
> ditch. Dust, a little bit of smoke was just rising up. As I
> pulled up I saw the Defendant in the driver's seat. My
> headlights shined right on him. [Porcello] was out of his
> vehicle so I rolled my window down to see if everyone was
> okay . . . .
>
> . . . .
>
> . . . [Porcello] said he didn't want to approach because he
> couldn't see the driver, didn't know if he had a gun or
> anything. So hearing gun I grabbed mine out of the cup
> holder and clipped my holster on and grabbed the
> flashlight so that we could see clearly and not get into a

> bad situation. And then we approached the vehicle
> together. I shown my light into the front of the vehicle and
> saw the Defendant. He was still in the vehicle on the
> accelerator trying to get it unstuck from the ditch.

Daniel also testified that Gaddis stumbled when he walked, smelled of alcohol, and

acted belligerently toward him. On cross-examination, Daniel testified that he

"believe[d]" he had testified at the first trial that he had seen Gaddis in the driver's

seat. He also testified he never saw Gaddis driving the vehicle because he was not

there at the time of the accident.

¶ 37      In an effort to impeach the State's witnesses, Dwyer called Ezeh, Gadds's

attorney from the first trial, to testify. Ezeh alleged that, at the first trial, Porcello

(1) was unable to identify how many people were in the truck; (2) could not "tell the

[c]ourt or give the [c]ourt any identifier as to who was driving the truck"; (3) "was

unable to tell . . . if [the driver was] black, white, male, [or] female"; and (4) "did not

testify in the previous trial that he saw . . . Gaddis in the truck." During his closing

argument, Dwyer emphasized these alleged discrepancies in Porcello's testimony. He

argued that the only way to prove that Gaddis was guilty was to prove that he was

driving the truck and that the only witness that allegedly saw Gaddis driving was

not "credible" due to his changing testimony. He also noted that Gaddis was not the

owner of the truck he was alleged to have driven.

¶ 38    Gaddis was convicted of driving while impaired and driving without a registration, and the trial court sentenced him to 24 months in the Misdemeanant Confinement Program.

## II.    Analysis

¶ 39    "Ordinarily, a motion to continue is addressed to the discretion of the trial court, and absent a gross abuse of that discretion, the trial court's ruling is not subject to review." *State v. Taylor*, 354 N.C. 28, 33 (2001). But when a party's motion to continue is predicated on that party's assertion of a constitutional right, we review the trial court's decision to deny the motion de novo. *See, e.g., In re C.A.B.*, 381 N.C. 105, 2022-NCSC-51, ¶ 14 (" 'If, however, the motion is based on a right guaranteed by the Federal and State Constitutions, the motion presents a question of law and the order of the court is reviewable' de novo." (quoting *State v. Baldwin*, 276 N.C. 690, 698 (1970))); *State v. Johnson*, 379 N.C. 629, 2021-NCSC-165, ¶ 16 ("Defendant's motion to continue raised a constitutional issue, requiring de novo review by this Court."). "When the trial court's denial of a [defendant's] motion to continue violates that [defendant's constitutional] rights, the 'harmless error' standard applies: specifically, the challenged order must be overturned unless the error was harmless beyond a reasonable doubt, and [the State] bears the burden of proving that the error was harmless." *In re C.A.B.*, ¶ 33 (cleaned up).

¶ 40          In this case, it is undisputed that Gaddis's motion to continue was predicated on his assertion of a constitutional right to the transcript of his first trial. The State concedes that "[h]ere, defendant's . . . motion to continue was premised upon his contentions that he was constitutionally entitled to a transcript of his mistrial, and that a continuous was required to allow for its receipt." The majority does not expressly acknowledge that it is reviewing the trial court's denial of Gaddis's motion de novo, as is required, but the majority appears to recognize de novo review is appropriate in concluding "that the trial court likely erred in failing to apply the two-part *Britt* test," *ante*, at ¶ 13, (the legal test used to discern whether denying an indigent defendant's request for a transcript is a constitutional violation) and that that any error committed by the trial court "was harmless beyond a reasonable doubt," *id.*, (the legal test used to determine whether a trial court's violation of a defendant's constitutional rights warrants reversal of a conviction). Thus, notwithstanding its imprecision, the majority opinion in no way casts doubt on the "well[-]settled" principle that de novo review is necessary when a trial court denies a defendant's motion to continue which was based on the defendant's assertion of a constitutional right. *See Piedmont Triad Reg'l Water Auth. v. Sumner Hills Inc.*, 353 N.C. 343, 348 (2001).

### A. The trial court's denial of Gaddis's motion to continue and motion for a transcript violated his constitutional rights

¶ 41    Denying an indigent defendant a free transcript violates that defendant's constitutional rights when (1) "a transcript is necessary for preparing an effective defense" and (2) there are no "alternative devices available to the defendant which are substantially equivalent to a transcript." *Rankin*, 306 N.C. at 716. Here, the transcript was necessary for Gaddis to prepare an effective defense, and the devices available in lieu of a transcript—Ezeh's notes and testimony—were not substantially equivalent to the transcript. Accordingly, denying Gaddis's motion to continue was a violation of his constitutional rights.

¶ 42    Our caselaw demonstrates that a transcript of prior proceedings is valuable—and often necessary—to an effective criminal defense. *See, e.g.*, *Britt*, 404 U.S. at 228 ("[A] transcript of a prior mistrial would be valuable to the defendant . . . as a tool at the trial itself for the impeachment of prosecution witnesses."); *State v Reid*, 312 N.C. 322, 323 (1984) (per curiam) (agreeing that the defendant needed a transcript of a prior mistrial "to effectively cross-examine the [S]tate's witnesses"). This is especially true when much of the State's case substantially depends on witness testimony, *see State v. Tyson*, 220 N.C. App. 517, 520 (holding that the trial court's denial of defendant's motion for a transcript was erroneous "especially in light of the fact that the State's case rested entirely on the victim's identification of defendant as the perpetrator"), or when the defendant's lack of a transcript will put him or her at a

disadvantage compared to the State, *see State v. Matthews*, 295 N.C. 265, 290 (1978) (reasoning that denial of a transcript was permissible because "[t]he scales were not tipped in favor of the State on this count"). In addition, this Court has recognized that a transcript is a tool that is not easily replaced. For example, in *Rankin*, we held that "access to the court reporter [from the previous proceeding] and her notes for use during the course of the trial" was not substantially equivalent to the transcript of that proceeding. 306 N.C. at 715 (emphasis omitted).

¶ 43        Here, a transcript—or something substantially similar—was necessary to Gaddis's defense. As his attorney argued, the State's case largely depended on the ability of an eyewitness to identify Gaddis as the driver of the vehicle. Gaddis did not and, given the results of his blood test, could not dispute that he was intoxicated. Thus, his best chance at acquittal was disputing that he had actually been driving the crashed vehicle. The best way of disputing that would have been to challenge the eyewitness testimony placing him behind the wheel before and immediately after the crash. Based on the notes from Ezeh, Gaddis's attorney during the mistrial, Dwyer believed that the witness testimony during the mistrial had been sufficiently vague so as to benefit his client. However, Dwyer worried that should the witnesses change their testimony from one trial to the next—which, according to Ezeh's testimony, did indeed happen—Dwyer would have no way to "stick them to" what they had said under oath at the previous trial. With no credible source to draw from, any factual

dispute would amount to Dwyer's (or Ezeh's) word against the witnesses' accounts. This put Gaddis at a significant disadvantage.

¶ 44        This disadvantage was even more severe considering the disparity of information between Dwyer and the prosecutor. Unlike Dwyer, the prosecutor was present for both trials. As Dwyer pointed out before trial, the prosecutor could use her experience from the mistrial to learn from her mistakes and "go after this case in a different fashion." In contrast, Dwyer was not present at the mistrial. In fact, he did not even know he had been appointed as Gaddis's defense counsel until two weeks before the new trial. He had no firsthand knowledge of what was said during the first trial and thus no independent way of knowing whether the State's witnesses' testimony remained consistent throughout; he had only his client's and Ezeh's notes and recollections to rely upon. A transcript of the mistrial would have helped rectify the imbalance of information between the parties. Because the court did not provide that transcript, the scales of justice were tipped in the State's favor.

¶ 45        The State argues that even if the transcript was necessary for preparing an effective defense, Gaddis had a substantially equivalent alternative: the notes, memory, and testimony of Ezeh. But at the second trial, the prosecutor made a compelling argument to the contrary illustrating why Ezeh's testimony was not equivalent to a transcript. During cross-examination, the prosecutor repeatedly attacked Ezeh's memory and motives:

> "And you can't say word for word what a witness said in that previous trial?"
>
> "And you haven't seen a transcript of the previous trial?"
>
> "Are you relying on your memory of that?"
>
> "And your notes and everything, those notes aren't actual trial transcripts in this case; correct?"
>
> "Again, it's been two months since this prior testimony happened. Your recollection is not fresh in this case; correct?"
>
> "And [when you represented defendant] at the time of that first trial you were interested in the outcome of the case?"
>
> "And Mr. Ezeh, again in the prior case you were interested in the outcome of the case?"

The prosecutor convincingly argued that Ezeh, like all people, was susceptible to bias and the limits of memory. A transcript, on the other hand, would not have suffered from these human shortcomings. With a transcript in hand, Dwyer could have pointed out specific discrepancies in witness testimony using an objective source of information—while the jury would be left to determine the significance of these discrepancies, there would be no disputing their existence. Instead, the best Dwyer could offer was Ezeh's testimony. The jury, after hearing conflicting testimony from the State's witnesses and from Ezeh, may have decided the State's witnesses were more credible. Afterall, they knew Ezeh had represented Gaddis and may not have been a neutral party. Therefore, Ezeh's testimony could not support Gaddis's efforts to impeach the State's witnesses in the way a transcript would have. Because

Gaddis's defense depended on impeaching the State's witnesses, and because the only device available to him to accomplish this task was not substantially equivalent to a transcript, Gaddis was deprived of a tool that was necessary to his defense in violation of his constitutional rights.

**B. The trial court's failure to grant a continuance was not harmless beyond a reasonable doubt**

¶ 46        Constitutional errors require reversal unless they are shown to be harmless. *See State v. Lawrence*, 365 N.C. 506, 513 (2012). The "harmless error" standard requires that we "declare a belief that [the error] was harmless beyond a reasonable doubt" before deciding to overlook a constitutional violation and affirm a judgment. *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). When a constitutional error has occurred, the State "bears the burden of showing that no prejudice resulted from the challenged . . . constitutional error." *Id.* Here, the majority concludes that even if providing Gaddis with a transcript would have enabled him to discredit the State's witnesses, the State has met its burden of proving that there is no reasonable possibility that the jury would have failed to find Gaddis guilty. *Ante*, at ¶ 13.

¶ 47        In coming to this conclusion, the majority relies heavily on the audio of Gaddis telling the arresting officer "now if you're going to blow smoke up my ass, I'm going to blow smoke up yours. We can go through this all day. Look here dude, that's my truck, I've been driving the mother-[expletive]." The majority confidently calls this an "admission." *Ante*, at ¶ 24. Notably, the trial court—the tribunal closest to the

evidence—refused to instruct the jury that Gaddis's comment was an admission of guilt. The majority's finding to the contrary is a dramatic overreading of Gaddis's comments, which must be viewed in context of facts casting significant doubt on the majority's chosen interpretation. These facts include that (1) Gaddis appears to have been highly inebriated; (2) the phrase "blow smoke" is commonly meant to denote that the speaker is lying[1]; (3) there is evidence that the truck was not, in fact, owned by Gaddis; (4) on multiple occasions in the same recording, Gaddis states that he was *not* the driver of the truck; and (5) both Dwyer and the State offered competing (but plausible) interpretations of the meaning of Gaddis's comments in the recording.

This uncertainty undercuts the majority's speculation that Gaddis would have been convicted even if the Gaddis had, armed with a transcript from his first trial, discredited the State's witnesses through more effective cross-examination. Absent this statement, the only direct evidence indicating Gaddis was driving the truck at the time it crashed was the State's witnesses' testimony. Gaddis expressly sought a transcript of his first trial in order to impeach the credibility of those witnesses, and there were in fact discrepancies between at least one of the witnesses' testimony at

---

[1] *See, e.g.*, *United States v. Fullerton*, 187 F.3d 587, 592 (6th Cir. 1999) (concluding that a prosecutor's "statement that the defense counsel was 'trying to blow smoke in the jury's faces'" was "improper" because it "indicat[ed] a personal belief in the witness's credibility"); *State v. Maye*, No. COA15-676, 2016 WL 1013179, at *3 (N.C. Ct. App. Mar. 15, 2016) (unpublished) (concluding that a prosecutor's statements that defense counsel's "theory of the case was '[a] bunch of crap'" and the defendant has "[n]ot only . . . blown smoke in your faces, but he's blown smoke in another part of your body" expressed an "impermissible personal opinion" regarding the defense (first alteration in original)).

the first trial and at the second trial. Rather than engage these inconvenient facts, the majority relies almost entirely on a statement it treats as an "admission" notwithstanding the trial court's express refusal to do the same.

¶ 49        The majority also cites other evidence including Gaddis's intoxication and presence near the vehicle around the time of the crash. *See ante*, at ¶ 22. But the evidence needed to demonstrate that a trial court's constitutional error was harmless is not the same as the evidence needed to sustain a conviction: when applying the harmless error standard, "[w]e are not concerned . . . with whether there was sufficient evidence on which the petitioner *could* have been convicted without the [trial court's error]. The question is whether there is a reasonable possibility that the [error] might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85, 86–87 (1963) (emphasis added). The undisputed facts which demonstrate that Gaddis was involved in an accident, was found at the scene of the accident, and was impaired at the time of the accident do not conclusively establish beyond any reasonable doubt that Gaddis was the person driving the vehicle at the time of the accident. In this case, there is a reasonable possibility that the trial court's constitutional error influenced the jury's verdict.

¶ 50        The conclusion that the evidence of Gaddis's guilt is not "overwhelming" is not just a theory. At Gaddis's first trial, the jury—having heard the same supposed "admission" and witness testimony the majority now relies upon—failed to convict

Gaddis. The majority chooses to ignore this mistrial entirely when it conducts its harmless error analysis, even though it is plainly relevant to the question of whether an acquittal was a reasonably possible outcome of Gaddis's second trial. The mistrial suggests that had Gaddis been provided a transcript to effectively hold the State's witnesses to the testimony they gave at the first trial, one or more jurors might have again failed to find him guilty beyond a reasonable doubt. Whether or not Gaddis was driving the truck when it crashed was a disputed question of fact, and there is a reasonable possibility that had Gaddis been able to obtain a transcript, he could have more thoroughly impeached the State's witnesses and convinced the jury to reach a different conclusion. Nevertheless, the majority deigns to find that Gaddis was driving the truck when it crashed. In so doing, the majority acts like a jury, not an appellate court, in substituting its own belief in Gaddis's guilt for a rigorous application of the requisite harmless error standard.

### III.   Conclusion

The United States Supreme Court wrote in *Griffin* that "[t]here can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin*, 351 U.S. at 19. As the Court acknowledged, money and justice have always been linked, but our system aspires to sever that connection. *Id.* One way to further that goal is the promise that if a defendant cannot afford a transcript from a prior proceeding, a transcript will be provided if it is necessary to the defendant's ability to

mount an effective defense. By assuming away Gaddis's constitutional rights based on an unfounded assertion regarding the strength of the State's case, the majority ignores the importance of this protection, frustrates our progress towards the goal of equal justice to all, and denies this defendant a fair trial. For these reasons, I respectfully dissent.

Justice HUDSON and Justice MORGAN join in this dissenting opinion.